**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL PENSION FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL WELFARE FUND,** | ) | |
| **CHICAGO & VICINITY LABORERS'** | ) | |
| **DISTRICT COUNCIL RETIREE HEALTH** | ) | |
| **AND WELFARE FUND, and CATHERINE** | ) | |
| **WENSKUS, not individually but as** | ) | |
| **Administrator of the Funds,** | ) | **Case No. 25-cv-11825** |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **REA MASONRY, LLC., an** | ) | |
| **Illinois limited liability company,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>COMPLAINT</u>**

Plaintiffs, Chicago & Vicinity Laborers' District Council Pension Fund, Chicago & Vicinity Laborers' District Council Health & Welfare Fund, Chicago & Vicinity Laborers' District Council Retiree Health & Welfare Fund, and Catherine Wenskus, not individually but as Administrator of the Funds, (collectively the "Funds"), by their attorneys Patrick T. Wallace, Amy N. Carollo, G. Ryan Liska, and Sara S. Schumann, and for their Complaint against Defendant REA Masonry, LLC. state as follow:

**COUNT I**

**(Failure to Submit Benefit Contributions)**

1.      Jurisdiction is based on Sections 502(e)(1) and (2) and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132 (e)(1) and (2) and 1145, Section 301(a) of the Labor Management Relations Act ("LMRA") of 1947 as amended, and 29 U.S.C. §185(a), 28 U.S.C. §1331.

2.      Venue is proper pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), and 28 U.S.C. §1391 (a) and (b).

3.      The Funds are multiemployer benefit plans within the meanings of Sections 3(3) and 3(37) of ERISA.  29 U.S.C. §1002(3) and 37(A).  They are established and maintained pursuant to their respective Agreements and Declarations of Trust in accordance with Section 302(c)(5) of the LMRA.  29 U.S.C. § 186(c)(5).  The Funds have offices and conduct business within this District.

4.      Plaintiff Catherine Wenskus  ("Wenskus") is the Administrator of the Funds, and has been duly authorized by the Funds' Trustees to act on behalf of the Funds in the collection of employer contributions owed to the Funds and to the Construction and General Laborers' District Council of Chicago and Vicinity Training Fund, and with respect to the collection by the Funds of amounts which have been or are required to be withheld from the wages of employees in payment of Union dues for transmittal to the Construction and General Laborers' District Council of Chicago and Vicinity (the "Union").  With respect to such matters, Wenskus is a fiduciary of the Funds within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

5.      Defendant REA Masonry, LLC, (hereinafter referred to as "Company") is an Illinois limited liability company and at all times relevant did business within this District and is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5), and Section 301(a) of the LMRA, 29 U.S.C. §185(c).

6.      The Union is a labor organization within the meaning of 29 U.S.C. §185(a).  At all times relevant herein, the Union and the Company have been parties to successive collective bargaining agreements, the most recent of which became effective June 1, 2021. (A true and

2

accurate copy of the most recent Collective Bargaining Agreement which adopts and incorporates the various area-wide collective bargaining agreements and the Funds' respective Agreements and Declarations of Trust is attached hereto as Exhibit A).

7.     The Funds have been duly authorized to serve as collection agents for the Union in that the Funds have been given the authority to collect from employer's union dues which should have been or have been deducted from the wages of covered employees.  Further, the Funds have been duly authorized by the Construction and General Laborers' District Council of Chicago and Vicinity Training Fund (the "Training Fund"), the Midwest Construction Industry Advancement Fund ("MCIAF"), the Mid-American Regional Bargaining Association Industry Advancement Fund ("MARBA"), the Chicagoland Construction Safety Council (the "Safety Fund"), the Laborers' Employers' Cooperation and Education Trust ("LECET"), the Concrete Contractors Association ("CCA"), the CDCNI/CAWCC Contractors' Industry Advancement Fund (the "Wall & Ceiling Fund"), the CISCO Uniform Drug/Alcohol Abuse Program ("CISCO"), the Laborers' District Council Labor Management Committee Cooperative ("LDCLMCC"), the Will Grundy Industry Trust Advancement Fund ("WGITA"), the Illinois Environmental Contractors Association Industry Education Fund ("IECA Fund"), the Illinois Small Pavers Association Fund ("ISPA"), and the Chicago Area Independent Construction Association ("CAICA") to act as an agent in the collection of contributions due to those Funds.

8.     The Pension, Welfare and Retiree Health and Welfare Declaration of Trust Agreement documents provide Trustees with the powers to formulate, establish and maintain collection procedures for collection of contributions and those actions, procedures and polices shall be binding upon all Contributing Employers.

9.     The Funds' Amended and Restated Collection and Audit Policies and Procedures

3

provides that in the event the Funds files suit against a Contributing Employer, any liquidated damages incurred by the Contributing Employer after the lawsuit is filed will be assessed liquidated damages at twenty percent (20%) of the contributions owed. Liquidated damages assessed against late paid contribution reports which were paid prior to a lawsuit being filed are assessed at 10% of report amount. This Collection and Audit Policies was adopted by the respective Trustees for the Pension, Welfare and Retiree Health and Welfare Funds.

10. The Agreement and the Funds' respective Agreements and Declarations of Trust obligate the Company to make contributions on behalf of its employees covered by the Agreement for pension benefits, health and welfare benefits, and/or benefits for the training fund and to submit monthly remittance reports in which the Company, *inter alia*, identifies the employees covered under the Agreement and the amount of contributions to be remitted to the Funds on behalf of each covered employee.

11. Late-paid Pension, Welfare, Retiree Welfare and Training Fund report contributions are assessed interest at a rate of 12% from the date the contributions were due until the contributions are paid.

12. The Agreement and the Funds' respective Agreements and Declarations of Trust requires the Company to submit its books and records to the Funds on demand for an audit to determine benefit contribution compliance.

13. The Agreement requires the Company to obtain and maintain a surety bond to guaranty the payment of future wages, pension and welfare benefits.

14. Notwithstanding the obligations imposed by the Agreement and the Funds' respective Agreements and Declarations of Trust, the Company performed covered work during the months of March 2025 through August 2025 but failed to pay the Funds all required contributions. According

4

to fringe benefit reports submitted but not paid the Company total $52,511.39 and are itemized by month as follows:

(a)     failed to pay contributions in the amount of $23,918.85 for the month of March 2025 thereby depriving the Pension, Welfare, Retiree Welfare and Training Funds of information and income necessary to administer the Funds;

(b)     failed to pay contributions in the amount of $17,008.61 for the month of April 2025 thereby depriving the Pension, Welfare, Retiree Welfare and Training Funds of information and income necessary to administer the Funds;

(c)     failed to pay contributions in the amount of $2,439.99 for the month of May2025 thereby depriving the Pension, Welfare, Retiree Welfare and Training Funds of information and income necessary to administer the Funds;

(d)     failed to pay contributions in the amount of $4,368.36 for the month of June 2025 thereby depriving the Pension, Welfare, Retiree Welfare and Training Funds of information and income necessary to administer the Funds;

(e)     failed to pay contributions in the amount of $3,664.98 for the month of July 2025 thereby depriving the Pension, Welfare, Retiree Welfare and Training Funds of information and income necessary to administer the Funds; and

(f)     failed to pay contributions in the amount of $1,110.60 for the month of August 2025 thereby depriving the Pension, Welfare, Retiree Welfare and Training Funds of information and income necessary to administer the Funds

15.     The Company's failure to pay its March 2025 through July 2025 fringe benefit reports resulted in 10% liquidated damages being assessed against the reports. Further, its late payment of its November 2024 through February 2025 fringe benefit reports resulted in liquidated damages being assessed against those reports. Accordingly, the Company owes $22,956.20 in accumulated liquidated damages on late-paid/unpaid fringe benefit reports.

16.     The Company's actions in failing to submit timely payment of benefit contributions reports violates Section 515 of ERISA, 29 U.S.C. §1145.

WHEREFORE, Plaintiffs respectfully request this Court enter the following order against Defendant REA Masonry, LLC. as follows:

a.      Judgment is entered in favor of the Funds and against Defendant REA Masonry, LLC. for unpaid fringe benefit contributions reported but not paid for March 2025 through August 2025 totaling $52,511.39 plus interest, reasonable attorney fees and costs;

b.      Judgment is entered in favor of the Funds and against Defendant REA Masonry, LLC. for liquidated damages in the amount of $22,956.20 plus reasonable attorney fees and costs; and

c.      Judgment is entered on monthly fringe benefit reports amounts that become due and are not paid by the Company during the pendency of this litigation; and

d.      For any other relief deemed just and equitable

**COUNT II**

6

**(Failure To Submit Dues Contributions)**

17.     Plaintiffs re-allege paragraphs 1 through 16 of Count I as this paragraph 17.

18.     Pursuant to agreement, the Funds have been duly designated to serve as collection agents for the Union in that the Funds have been given the authority to collect from employer's union dues which have been or should have been deducted from the wages of covered employees.

19.     Notwithstanding the obligations imposed by the Agreement and the Funds' respective Agreements and Declarations of Trust, the Company has failed to pay dues reports for the period of April 2025 through June 2025 totaling $1,523.03 plus ten percent (10%) liquidated damages.

20.     The Company has failed to submit its October 2024 through March 2025 and July 2025 through August 2025 dues reports.    The amount of those dues reports is unknown and the Company will be assessed ten percent (10%) liquidated damages on those reports.

WHEREFORE, Plaintiffs respectfully request that this Court enter the following order in against Defendant REA Masonry, LLC.:

   a.   Judgment is entered in favor of the Funds and against Defendant REA Masonry, LLC. for unpaid dues contributions reported but not paid for April 2025 through June 2025 totaling $1,523.03 plus ten percent (10%) liquidated damages, reasonable attorney fees and costs;

   b.   Judgment is entered in favor of the Funds and against Defendant REA Masonry, LLC. for amounts determined to be owned by the Company for its October 2024 through March 2025 and July 2025 through August 2025 dues contributions reports plus 10% liquidated damages and attorneys' fees and costs;

   c.   For any other relief deemed just and equitable.

7

## COUNT III

### (Breach of Labor Agreement- Failure to Post Bond)

21.     The Funds re-allege and incorporate the allegations contained in paragraphs 1-16 of this Complaint.

22.     Article IX of the Agreement provides all signatory employers shall maintain a surety bond in a form and amount satisfactory to the Union, but not less than $5,000.00 to guarantee the payment of wages, pension and welfare contributions.

23.     The Funds, as a beneficiary of the Agreement, have been authorized by the Union to enforce the bond provision of the Agreement.

24.     The form of the bond required by the Union is either a traditional surety bond back by an insurer or a cash bond.

25.     In accordance with the Agreement and/or the Funds collection procedures and based upon the Company's workforce, the Company is required to post either a paper or cash bond in the amount of $5,000.00.

26.     On or about September 16, 2025, the Funds advised the Company that it was in breach of the Agreement by failing to maintain a surety bond.

27.     Pursuant to the Revised Surety Bond Policy adopted by the Laborers' Funds' Board of Trustees, the Company has 120 days to post a $5,000.00 bond or the bond requirement will be doubled to a $10,000.00 bond.

28.     Under the terms of Agreement, if the Company fails to post the bond it is liable for all attorney fees and costs incurred in seeking to enforce the Agreement's bond provision.

29.     Failure to post the $5,000.00 bond constitutes a breach of the Agreement, and places the Funds, Union and its members at risk that the obligation owed by the Company will be met in a timely fashion because the security required by the Agreement is not available.

WHEREFORE, Laborers' Funds respectfully request that this Court:

a.     enter judgment against Defendant REA Masonry, LLC in the amount of $5,000.00 which shall be used by the Funds as a cash bond or in the alternative, order REA Masonry, LLC. to immediately post a $5,000.00 surety bond;

b.     ordering Defendant REA Masonry, LLC. to reimburse the Funds for all attorney's fees and costs incurred in pursuing this action; and

c.     granting any other relief deemed just and equitable.


September 29, 2025                                     Chicago & Vicinity Laborers' District
                                                      Council Pension Fund, et al.

                                                      By:  /s/ G. Ryan Liska

G. Ryan Liska
Office of Fund Counsel
11465 W. Cermak Road
Westchester, IL 60154
(312) 692-1540

**JUNE 1, 2021 TO MAY 31, 2026**

## BUILDING AGREEMENT

between the

**CHICAGOLAND ASSOCIATED
GENERAL CONTRACTORS**

**MASON CONTRACTORS' ASSOCIATION
OF GREATER CHICAGO**

**GREAT LAKES CONSTRUCTION ASSOCIATION**

Represented by the

**MID-AMERICA REGIONAL BARGAINING
ASSOCIATION**

and the

**CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY**

EXHIBIT A

**TABLE OF CONTENTS**

| Article | | Page |
|---|---|---|
| I | EQUAL OPPORTUNITY ................. | 5 |
| II | HOURS AND OVERTIME ............... | 5 |
| III | MULTIPLE SHIFTS ................... | 7 |
| IV | SUNDAYS, HOLIDAYS AND ELECTION DAYS ...................... | 7 |
| V | UNION SECURITY ................... | 10 |
| VI | CHECK-OFF & DUES DEDUCTIONS ...... | 10 |
| VII | SUBCONTRACTING .................. | 12 |
| VIII | WAGES ........................... | 13 |
| | Dosimeter Use ........................ | 15 |
| | Power Pac .......................... | 15 |
| | Westchester Health and Welfare ........... | 15 |
| | Westchester Pension Fund ............... | 16 |
| | Fox Valley Health and Welfare ........... | 19 |
| | Fox Valley Pension Fund ............... | 22 |
| | Reciprocity ......................... | 25 |
| | Excess Benefit Fund ................... | 25 |
| | Chicagoland Laborers' Vacation Fund ...... | 26 |
| | Chicagoland Laborers' Annuity Fund ...... | 26 |
| | Supervisors ......................... | 26 |
| | Out of Town Work .................... | 27 |
| | Special Rules for Bonding ............... | 27 |
| | Withdrawal of Employees ............... | 28 |
| IX | BONDING .......................... | 28 |
| | Withdrawal of Employees ............... | 29 |
| X | INDUSTRY FUND .................... | 30 |
| XI | PARTICULAR WORK RULES AND CLARIFICATION OF CONDITIONS ....... | 31 |
| | Foreman ........................... | 34 |
| | Direct Deposit ....................... | 35 |
| | Liquidated Damages ................... | 36 |
| | Hiring Hall ......................... | 37 |

| Article | Page |
|---|---|
| Key Man | 37 |
| Public Health Emergencies | 38 |
| XII STEWARDS | 38 |
| XIII REPORTING FOR WORK | 40 |
| XIV PAYDAY | 40 |
| XV TRAINING APPRENTICE PROGRAM | 41 |
| Apprentice Committee | 41 |
| Apprenticeship & Training Fund | 42 |
| Mandatory Apprenticeship | 43 |
| XVI SETTLEMENT OF DISPUTES | 44 |
| Wage Audits | 46 |
| XVII BRANCHES OF WORK | 47 |
| Recognition of Bargaining Representative | 47 |
| Branches of Work Covered Herein | 48 |
| Work Not Included | 59 |
| Wrecking | 59 |
| Wrecking: Complete Demolition. | 59 |
| Flying Forms | 59 |
| XVIII ALCOHOL AND SUBSTANCE ABUSE | 60 |
| XIX PRE-JOB CONFERENCES | 60 |
| XX ACCESS TO PREMISES | 61 |
| XXI APPROVALS | 61 |
| Savings Clause | 61 |
| Employer's Warranty | 62 |
| Execution | 62 |
| SIGNATURE OF PARTIES | 62 |
| ADDENDUM | 63 |
| Construction Industry Service Corporation | |
| Uniform Drug/Alcohol Abuse Program | 63 |
| Work Rules Committee | 68 |
| SIDE LETTER 1 | 69 |
| SIDE LETTER 2 | 69 |

3

**JUNE 1, 2021 TO MAY 31, 2026**

# BUILDING AGREEMENT

between the

**CHICAGOLAND ASSOCIATED
GENERAL CONTRACTORS**

**MASON CONTRACTORS' ASSOCIATION
OF GREATER CHICAGO**

**GREAT LAKES CONSTRUCTION ASSOCIATION**

Represented by the

**MID-AMERICA REGIONAL BARGAINING
ASSOCIATION**

and the

**CONSTRUCTION AND GENERAL
LABORERS' DISTRICT COUNCIL
OF CHICAGO AND VICINITY**

**TERM OF CONTRACT**

This AGREEMENT entered into this 1st day of June, 2021, for Cook, DuPage, Lake, Will, Grundy, Kendall, Kane, McHenry and Boone Counties by and between the CHICAGOLAND ASSOCIATED GENERAL CONTRACTORS, the MASON CONTRACTORS' ASSOCIATION OF GREATER CHICAGO, and the GREAT LAKES CONSTRUCTION ASSOCIATION represented by the MID-AMERICA REGIONAL BARGAINING ASSOCIATION, hereinafter referred to as EMPLOYER, and CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY, for and on behalf of its affiliated local Unions, hereinafter referred to as the UNION, shall remain in full force and effect until 11:59 p.m. on May 31, 2026.

4

If either party wishes to modify this Agreement, it shall serve written notice by certified or registered mail, upon the other party not less than sixty days prior to May 31, 2026 of its intent to begin negotiations for a new Agreement. In the absence of the service of such notice, this Agreement shall automatically renew itself, together with all amendments and improvements as negotiated after said initial expiration date, by and between the parties in area-wide bargaining, from year to year thereafter.

## ARTICLE I
## EQUAL OPPORTUNITY

The parties agree that Employees will not be discriminated against because of race, creed, religion, color, age, sex or national origin.

The masculine gender has been used in this Agreement to facilitate ease of writing and editing and therefore the masculine gender shall include the feminine gender. Whenever the words "he", "him", "his", or "man" is used, they shall be read and construed as "he or she", "him or her", "his or hers", and "man or woman", respectively.

## ARTICLE II
## HOURS AND OVERTIME

**Paragraph 1.** A single shift, eight (8) hours per day, between the hours of 7:00 a.m. and 3:30 p.m., Monday through Friday, shall constitute the normal workday and straight time shall be paid.

On Monday through Friday, the first eight (8) hours' work shall be paid at straight time, the next four (4) hours at time and one-half, and double time thereafter.

On Saturdays, time and one-half will be paid for the first ten (10) hours worked and double time thereafter. On Sundays, all hours are to paid at the rate of double time until the start of the Monday shift.

Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has

failed to comply with a JCG or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time. The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock pm on the preceding Friday. The notice to the Union shall be through the District Council's web portal.

**Paragraph 2.** Starting times may be adjusted by the Employer, upon notice to and clearance by the Union, from 6:00 a.m. to 9:00 a.m. at straight time.

Double time will be paid for all hours worked before 6:00 a.m. unless multiple shifts are working.

It is the Employer's responsibility to inform the Employee and obtain clearance from the Union of any change in starting time prior to quitting time the day before such change is to be effective.

**Paragraph 3.** During the period between April 1 and November 30, no more than once per calendar month, one designated Saturday may be used as a make-up day, due to inclement weather, at straight time while tending masons; provided, however, that after forty (40) hours have been worked, time and one-half will be paid. Contractors utilizing this provision shall notify the Union in writing, by no later than 4:00 pm on the Friday preceding the make-up day, on a form provided by the Union, specifying the date and location of the make-up work to be performed and the employees so working. An Employer who violates this section shall pay as a penalty double time for all hours worked.

**Paragraph 4.** When one-night shift is used to perform emergency work which cannot be done during the normal work day, such work shall be paid for at time and one-half for the first eight (8) hours, and double time thereafter.

6

**Paragraph 5.** When work to be performed in occupied buildings is of such a nature that it is not appropriate or practical during the regular work day, such as renovation, alteration and modernization, such work may be performed at an adjusted time; provided a pre-job conference takes place, between the Business Manager with jurisdiction over the worksite and the Employer, and permission is granted by the Union. Contractors utilizing the provision shall notify the Union by requesting the pre-job conference on the form provided by the Union.

By mutual consent of the Employer and the Union, the starting and quitting times of any shift, including day work, may be changed for all or any portion of a particular job. However, the adjusted shift shall run a minimum of three (3) consecutive days. All Employees working under this provision shall receive eight (8) hours pay for seven (7) hours worked. Laborers working through lunch on this shift shall be compensated one (1) additional hour of pay in addition to pay for all hours worked. Any and all work in excess of seven (7) hours under this provision shall be paid at the rate of double time. An Employer who violates this section shall pay, as a penalty, double time for all hours worked. Where the adjusted shift runs less than three (3) consecutive days, Laborers shall be paid in accordance with Paragraph 4 (Emergency Work).

An employee required to work through his or her eating period shall nevertheless work for at least 8.5 hours (inclusive of one half hour paid at time and one half).

### ARTICLE III
### MULTIPLE SHIFTS

**Paragraph 1.** When it is necessary that the contractor use more than one shift for a period of three (3) or more consecutive days, the Union shall be notified twenty-four (24) hours in advance of the effective date of the starting of such multiple shift operations.

**Paragraph 2.** On Multiple Shift arrangements, the work week shall start at 12 o'clock midnight Sunday, and

continue until 11:59 p.m. Friday. In no event shall the regular working hours of different shifts overlap.

**Paragraph 3.** When three (3) eight (8) hour shifts are used, the employees shall receive eight (8) hours' pay for seven and one-half (7½) hours worked; which shall include one-half (½) hour for eating within the (7½) hours.

It shall be a violation of this Agreement if an Employee does not receive eight (8) hours' pay. Employees who work seven and one-half (7½) hours on a shift without receiving one-half (½) hour lunch shall receive, in addition to the eight (8) hours' pay, one (1) hours' pay at time and one-half.

**Paragraph 4.** When two twelve (12) hour shifts are used, an eating period of one-half (½) hour shall be allowed within each shift without deductions in pay, and all time in excess of eight (8) hours shall be paid at the overtime rates, that is to say, the two and one-half (2½) hours immediately following the first eight (8) hours shall be paid for at the rate of time and one-half, and double time thereafter.

Employees who work one of two (2) twelve (12) hour shifts without receiving a one-half (½) hour lunch shall receive, in addition to the twelve (12) hours' pay as provided in this Section, one-half (½) hour pay at double time.

**Paragraph 5.** When two (2) eight (8) hour or two (2) ten (10) hour shifts are used, an eating period of one-half (½) hour shall be allowed, but not paid for, and all time in excess of eight (8) hours worked shall be paid at overtime rates (that is, two and one-half (2½) hours immediately following the first eight (8) hours shall be paid for at the rate of time and one-half, and double time thereafter).

**Paragraph 6.** On Saturday, other than single time shift, shift work shall start at 12:01 a.m. and the first eight (8) hours of each shift shall be paid for at the rate of time and one-half, and thereafter double time shall be paid; however, under no conditions shall more than eight (8) hours be worked at the rate of time and one-half on any one shift.

8

## ARTICLE IV
## SUNDAYS, HOLIDAYS AND ELECTION DAYS

**Paragraph 1**. All work performed on Sundays or on the following holidays: New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day, or on Mondays when such holidays are celebrated, shall be paid for at the double time rate. There shall be no work performed on Labor Day, excepting in case of dire emergency, and with the written consent of the District Council. If a holiday falls on a Sunday, it shall be celebrated on the following Monday. If a holiday falls on a day other than Sunday, it shall be celebrated on that date.

**Paragraph 2.** On Election Days, the individual employed in this trade shall be allowed time not to exceed two (2) hours, without pay, for the purpose of voting, provided that the worker on the job has given notice to the Employer or his agent and has made arrangements no less than twenty-four (24) hours in advance, to receive such time off.

**Paragraph 3.** When a holiday falls on Monday through Friday, make-up days on Saturday shall be paid at time and one-half for the first ten (10) hours and double time thereafter.

**Paragraph 4.** Unless the Employer is delinquent in the payment of fringe benefit fund contributions or working dues, has failed to comply with a JGC or arbitration award, or is in violation of JATC rules, in weeks that have designated holidays, but not more often than six (6) times per year, the Employer may schedule four (4) consecutive ten (10) hour work days at straight time. The four (4) ten-hour workdays can be nonconsecutive if the other trades working alongside the Laborers are working the same schedule. In order to use this alternate work schedule, the Union and the Employees must have notice no later than four o'clock pm on the preceding Friday. The notice to the Union shall be through the District Council's web portal.

9

## ARTICLE V
## UNION SECURITY

All new Employees shall be required to join the Union after the expiration of seven (7) days of employment or seven (7) days after the execution date of this Agreement, whichever is later, and shall remain members of the Union in good standing as a condition of continued employment.

Good standing shall mean payment of the initiation fees and both working and non-working dues uniformly required as a condition of acquiring or retaining membership in a Local Union. Employees covered by this Agreement at the time it is signed, and who are members of the Union at that time, shall be required as a condition of continued employment, to continue membership in the Union for the duration of this Agreement. Employees covered by this Agreement at the time it has been signed, and who are not members of the Union at that time shall be required to join the Union seven (7) days after the date of execution of this Agreement and remain members of the Union in good standing for the duration of this Agreement.

## ARTICLE VI
## CHECK-OFF & DUES DEDUCTIONS

**Paragraph 1.** Employers also agree to deduct from the gross payroll earnings payable to an Employee covered by this Agreement, initiation fees and quarterly Union dues insofar as permitted by state and federal laws upon receipt and in accordance with a duly executed authorization form from the Employee. Said authorization form shall not be revocable for a period of more than one (1) year or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 2.** All Employers covered by this Agreement shall deduct from the gross payroll earnings of Employees covered by said contract, working dues in the amount designated by the Union and shall remit monthly

10

to the Union office the sums so deducted, together with an accurate list of Employees from whose wages said dues were deducted and the amounts applicable to each Employee, not later than the 10th day of the month next following the month for which such deductions were made. Dues remittance reports shall include a report of the hours worked and wages earned by each Laborer. Employers who fail to timely remit Union dues shall be assessed an additional ten percent (10%) liquidated damages. The Union shall give thirty (30) days' prior written notice to the Employer of any change in the rate of dues to be deducted and remitted.

**Paragraph 3.** It is the intention of the parties that such deductions shall comply with the requirements of Section 302(c)(4) of the Labor Management Relations Act of 1947, as amended, and that such deductions be made only pursuant to written assignments from each Employee on whose account such deductions are made, which assignment shall not be revocable for a period of more than one (1) year, or prior to the termination date of this Agreement, whichever occurs sooner.

**Paragraph 4.** The Union agrees that it will indemnify and hold harmless the Employer from any and all claims, suits, causes of action, or otherwise, as regards the creation and administration of the dues check-off established by this Article and such indemnity and agreement to hold harmless shall include the payment of costs and attorneys' fees on behalf of the beneficiaries of such indemnity.

**Paragraph 5.** Should any Employer fail to remit dues to the Union as required under this Agreement, the Employer shall be liable for and pay all costs of collection, including reasonable audit expenses and reasonable attorney fees and costs. The Union may file suit, or remove Employees that it represents, or both, for non-remittance or underpayment of dues by an Employer.

**Paragraph 6.** Effective June 1, 2022, the Employer shall submit monthly dues remittance reports to the Union through the District Council web portal.

11

# ARTICLE VII
## SUBCONTRACTING

Paragraph 1. On work covered by this Agreement, the contractor or subcontractor agrees to see that all subcontractors on work within the Union's jurisdiction on this job site adhere to the wages and fringes contained in this Agreement when the subcontract is let by the contractor or subcontractor. If, upon the Union's request, the subcontractor chooses to sign a current labor agreement with the Union (although such signing might not be required under Paragraph 1), then the contractor shall be relieved of any liability under this Paragraph 1.

**Paragraph 2.** The Employer agrees that it will not contract or subcontract any work covered by this Agreement to be done at the site of construction, alteration, painting or repair of a building, structure or other work, except to a person, firm or corporation that is party to the applicable collective bargaining agreement with the Union.

**Paragraph 3.** If an Employer, bound to this Agreement, contracts or subcontracts any work covered by this Agreement to be done at the jobsite of the construction, alteration, painting or repair of a building, structure or other work to any person or proprietor who is not signatory to this Agreement, the Employer shall require such subcontractor to be bound by all the provisions of this Agreement, or the Employer shall maintain daily records of the subcontractor's or the subcontractor's Employees jobsite hours and be liable for payments to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund and the Construction and General Laborers' District Council of Chicago and Vicinity Joint Apprentice and Training Trust Fund as provided in Article VIII, Paragraphs 2-4 inclusive, and Article XV of this Agreement.

**ARTICLE VIII**
**WAGES**

**Paragraph 1.** The rates of wages exclusive of fringe benefits to be paid in this trade for the period June 1, 2021 to and including May 31, 2026, shall be as set forth below for the respective following classifications as further defined herein.

The wage rates include a total economic increase of two dollars and forty-five cents ($2.45) per hour effective June 1, 2021 to May 31, 2022, two dollars and fifty cents (2.50) per hour total economic increase effective June 1, 2022 to May 31, 2023, two dollars and fifty-five cents ($2.55) per hour total economic increase effective June 1, 2023 to May 31, 2024, two dollars and sixty cents ($2.60) per hour total economic increase effective June 1, 2024 to May 31, 2025, and two dollars and sixty-five cents ($2.65) per hour total economic increase effective June 1, 2025 to May 21, 2026.

The total economic increase shall be allocated between wages and fringe benefits and other funds by the Union in its sole discretion, except that the Union agrees that it shall allocate sufficient funds to the pension fund of the Union from the total economic package increases set forth above in each year of this agreement such that the pension fund remains in green status as defined by the Pension Protection Act of 2006, or any successor legislation. The foregoing allocations may include allocations to LECET and LDC/LMCC.

For the economic increases listed above, the Union shall also have discretion to allocate to another fund(s) to be established, up to a maximum of thirty cents ($0.30) per hour over the term of the Agreement (up to twelve cents ($0.12) in the first year and up to eighteen cents ($0.18) over the remaining years.) The fund(s) shall indemnify and hold harmless Employers who have assigned their bargaining rights to a MARBA-represented Association for purposes of collective bargaining with the Union, and the MARBA-represented Associations party

13

to this Agreement, and MARBA, as regards the creation, implementation and operation of the fund(s), other than the obligation to contribute the designated amounts to the fund(s), and such indemnity and hold harmless shall include the payment of all reasonable costs and attorney's fees actually incurred on behalf of the Employer. The Employer shall give prompt notice to the fund(s) of any claims asserted or suits filed that are subject to indemnification.

| CLASSIFICATION | 6/1/21 | 6/1/22 | 6/1/23 | 6/1/24 | 6/1/25 |
|---|---|---|---|---|---|
| Building Laborers | $45.90 | $2.50* | $2.55* | $2.60* | $2.65* |
| Fire Brick Work and Boiler Setter Laborers | 46.225 | | | | |
| Jackhammerman (On Firebrick Work Only) | 46.175 | | | | |
| Boiler Setter Plastic Laborers | 46.35 | | | | |
| Chimney Laborers (Over 40 Feet) | 46.00 | | | | |
| Chimney on Firebrick | 46.25 | | | | |
| Scaffold Laborers | 46.00 | | | | |
| Caisson Diggers | 46.25 | | | | |
| Jackhammerman | 46.125 | | | | |
| Power Driven Concrete Saws, Other Power Equipment | 46.125 | | | | |
| Stone Derrickman and Handlers | 46.10 | | | | |
| Fireproofing and Fire Shop Laborers | 45.90 | | | | |
| Well Point System Men | 46.25 | | | | |
| Pumps for Dewatering, other Unclassified Laborers | 45.90 | | | | |
| Windlass and Capstan Person | 46.05 | | | | |
| Cement Gun Nozzle Laborers (Gunite) | 46.05 | | | | |
| Cement Gun Laborers | 45.975 | | | | |
| Plaster Laborers | 45.90 | | | | |

*allocated by Union in its discretion provided sufficient funds shall be allocated to pension fund to remain in green status

(See above paragraph)

**Material Testing Laborer I**
(Hand coring and drilling for testing of materials; field inspection of uncured concrete and asphalt) . . . 35.90

**Material Testing Laborer II**
(Field Inspection of welds, structural steel, fireproofing, masonry, soil, facade, reinforcing steel, formwork, cured concrete, and concrete and asphalt batch plants; adjusting proportions of bituminous mixtures.) . . . . . . . . . 40.90

| | | |
|---|---|---|
| Apprentices (1st 6 months) | 60% of base rate . . . . . . . | $27.54 |
| Apprentices (2nd 6 months) | 70% of base rate . . . . . . . | $32.13 |
| Apprentices (3rd 6 months) | 80% of base rate . . . . . . . | $36.72 |
| Apprentices (4th 6 months) | 90% of base rate . . . . . . . | $41.31 |
| Apprentices (after 24 months) | 100% of base rate . . . . . . . | $45.90 |

Sub-Foremen shall receive $0.45 premium wages over and above top Laborers' Scale under his supervision.

Building Labor Foremen, General Foremen and Superintendents shall receive $0.75 premium wages over and above top Laborers' Scale under his supervision.

**Dosimeter Use.** A premium of One ($1.00) Dollar per hour shall be paid to any Laborer required to work with a dosimeter used for monitoring nuclear exposure or with any similar instrument or measuring device.

**Power Pac.** When a Laborer uses a power driven piece of equipment he shall be paid the rate of pay of the tool at the end of the power pac.

**Paragraph 2A. WESTCHESTER HEALTH AND WELFARE.** Employers that employ Employees who participate in the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity may contribute directly to these funds in the amounts allocated for the Westchester Funds by the Union from the economic package and will be subject to the following.

Beginning the period from June 1, 2021 to May 31, 2022, the Employer agrees to make Health and Welfare contributions of sixteen dollars and fifty-five cents

15

($16.55) per hour for each hour worked by all Employees who are covered by this Agreement in addition to the wages herein stipulated. This sixteen dollars and fifty-five cents ($16.55) per hour shall be paid to the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity or a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024 and June 1, 2024 to May 31, 2025, and June 1, 2025 to May 31, 2026; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article VIII, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity, as well as any amendments thereto.

**Paragraph 2B. WESTCHESTER PENSION.** Employers that employ Employees who participate in the Laborers' Pension Fund may contribute directly to these funds in the amounts allocated for the Westchester Funds by the Union from the economic package and will be subject to the following.

Beginning June 1, 2021, the Employer agrees to make a pension contribution of fourteen dollars and seventy-one cents ($14.71) per hour for each hour worked by all Employees who are covered by this Agreement in addition to the wages and welfare payments herein stipulated. This fourteen dollars and seventy-one cents ($14.71) per hour shall be paid to the Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024, June 1, 2024 to May 31, 2025, and June 1, 2025 to May 31, 2026 that on May 1

16

of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year (See Article VIII, Paragraph 1). The Union agrees that it shall allocate sufficient funds to the pension fund of the Union from the total economic package increases set forth above in each year of this agreement such that the pension fund remains in green status as defined by the Pension Protection Act of 2006, or any successor legislation.

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Laborers' Pension Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to Employee fringe benefit accounts, administered by the Trustees on behalf of each Employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

17

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

Further, in the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VI.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of

18

the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

Article III, Section 2 of the trust agreements of the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund shall be amended to include the following: "Association-appointed Trustees must be full-time Employees of contributing Employers within the Association's membership. A contributing Employer shall be defined as an Employer that has employed an average of five (5) or more Laborers performing bargaining unit work for whom contributions have been made per month in each of the previous three (3) calendar years."

The parties agree that the Health and Welfare Department of Construction and General Laborers' District Council of Chicago and Vicinity and the Laborers' Pension Fund will be operated and administered by a board of trustees that is expanded to include eight (8) Employer and eight (8) Union trustees. Appointing authority for the two additional Employer trustees shall be vested with new Employer associations that currently are not party to the trust agreements and under whose labor agreements more than 20,000 hours of benefits were paid in 2005.

**Paragraph 3A. FOX VALLEY HEALTH AND WELFARE.** Employers that employ Employees who participate in the Fox Valley Laborers' Health and Welfare Fund may contribute directly to these funds in the amounts allocated for the Fox Valley Funds by the Union from the economic package and will be subject to the following.

Beginning the period from June 1, 2021 to May 31, 2022, the Employer agrees to make Health and Welfare contributions of fourteen dollars and thirty-six cents ($14.36) per hour for each hour worked by all Employees

19

who are covered by this Agreement and participate in the Fox Valley Laborers' Health and Welfare Fund, in addition to the wages herein stipulated. This fourteen dollars and thirty-six cents ($14.36) per hour shall be paid to the Fox Valley Laborers' Health and Welfare Fund or a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024 and June 1, 2024 to May 31, 2025, and June 1, 2025 to May 31, 2026 ; that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article VIII, Paragraph 1).

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Fox Valley Laborers' Health and Welfare Fund, as well as any amendments thereto.

The parties agree that the Employer shall make lump sum contributions to Employee fringe benefit accounts, administered by the Trustees on behalf of each Employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of

the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

All reports and payments of contributions due to the respective fringe benefit funds shall be due on the tenth (10th) day of the month following the month in which the hours were worked.

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

In the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative,

21

whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VI.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 3B. FOX VALLEY PENSION FUND.** Employers that employ Employees who participate in the Fox Valley and Vicinity Laborers' Pension Fund may contribute directly to these funds in the amounts allocated for the Fox Valley Funds by the Union from the economic package and will be subject to the following.

Beginning June 1, 2021, the Employer agrees to make a pension contribution of sixteen dollars and ninety cents ($16.90) per hour for each hour worked by all Employees who are covered by this Agreement and participate in the Fox Valley and Vicinity Laborers' Pension Fund, in addition to the wages and welfare payments herein stipulated. This sixteen dollars and ninety cents ($16.90) per hour shall be paid to the Fox Valley and Vicinity Laborers' Pension Fund or to a designated appointee at the end of each month.

That for the periods June 1, 2022 to May 31, 2023; June 1, 2023 to May 31, 2024, June 1, 2024 to May 31, 2025, and June 1, 2025 to May 31, 2026 that on May 1 of each year, if able, but not later than June 1, the Union in its sole discretion, shall determine the amount of additional contributions to Welfare and/or Pension and Training to be allocated from the economic package for that year. (See Article VIII, Paragraph 1). The Union agrees that it shall allocate sufficient funds to the pension

22

fund of the Union from the total economic package increases set forth above in each year of this agreement such that the pension fund remains in green status as defined by the Pension Protection Act of 2006, or any successor legislation.

The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the Fox Valley and Vicinity Laborers' Pension Fund, as well as any amendments thereto. The parties agree that the Employer shall make lump sum contributions to Employee fringe benefit accounts, administered by the Trustees on behalf of each Employee. It is further agreed that such contribution shall be accompanied by a breakdown of payment according to appropriate benefits.

Contributions to all fringe benefit funds under this Agreement shall be made in increments of no less than one-half hour for each half-hour or portion thereof an employee performs covered work.

The Trustees of the Welfare Fund and the Trustees of the Pension Fund shall, among other things, have authority to determine the type and amount of benefits to be provided in each of said funds, the eligibility rules governing entitlement to benefits, and whether and to what extent benefits are to be provided for covered Employees.

The failure of the Employer to contribute to the said Welfare or Pension Funds when the same is established, as provided herein, shall for the purposes of the remedies the Union may pursue, be deemed the same as the failure of the Employer to pay wages, and the Union shall be permitted to remove workers whom they represent for non-payment of such contributions, anything to the contrary in this Agreement notwithstanding.

All reports and payments of contributions due to the respective fringe benefit funds shall be due on the tenth (10th) day of the month following the month in which the hours were worked.

23

A grace period of thirty (30) days shall be granted for Employers to submit reports and contributions as provided. Said reports and contributions not received during this grace period shall be assessed liquidated damages amounting to ten (10%) percent of the amount of the contributions which are owed. The Employer acknowledges that the liquidated damages shall be used to defer administrative costs arising by said delinquency and acknowledges the costs to be actual and substantial, though difficult to ascertain. However, the Employer acknowledges these costs to be at a minimum of ten (10%) percent, waiving the necessity of any additional proof thereof. In addition, the delinquent contributions shall bear interest at a maximum legal rate of interest per annum from the due date until they are paid.

In the event the Trustees refer the account to legal counsel for collection, the delinquent Employer shall be liable for reasonable attorneys' fees, and for all reasonable costs incurred in the collection process, including court fees, audit fees, etc.

Reasonable attorneys' fees shall mean: All reasonable attorneys' fees in the amounts for which the Trustees become legally bound to pay, including recovery of liquidated damages, interests, audit costs, filing fees, and any other expenses incurred by the Trustees.

The Trustees of the aforementioned Welfare and Pension Funds and the Union shall have the authority to audit the books and records of a participating Employer, either directly or through their authorized representative, whenever such examination is deemed necessary for the purpose of compliance with the provisions of this Agreement, including the obligation to remit Union Dues under Article VI.

Each participating Employer shall make its books and records available to the Trustees for such purpose. In the event the audit discloses that the Employer, during the period of the audit, has underpaid its contributions and/or wages, the Employer shall be liable for the costs of

24

the examination, including but not limited to, audit fees and reasonable attorneys' fees. The Trustees' authority to waive any costs shall be governed by the terms of the Trust Agreement.

**Paragraph 4. RECIPROCITY.** The parties agree that, whenever contributions are made on behalf of an Employee to welfare and pension funds that are not the home funds of the Employee, the funds receiving such contributions, in accordance with the funds' Reciprocity Agreement, shall transfer such contributions to the home funds and the home fund shall reallocate the contributions between such home funds in the amounts set forth herein.

Subject to the reciprocity provisions of this Article, contributions shall be remitted to the Fox Valley Laborers Health and Welfare Fund and Fox Valley and Vicinity Laborers Pension Fund for all hours worked by any laborer or for any person employed by the Employer doing labor or construction work as herein above defined in Article XVII hereof, within the jurisdiction of Locals 582 or 1035 or any successor locals covering Kane, Kendall, McHenry or Boone Counties, Illinois.

The foregoing, however, is not intended to and shall not interfere with the practices, requirements or understandings developed under the Fox Valley Agreements concerning those employees who participate in the Westchester Funds, which practices, requirements or understandings shall remain in effect and undisturbed.

**Paragraph 5. Section 415 Excess Benefit Fund.** A Section 415 Excess Benefit Fund shall be established for the purpose of providing alternative benefit to any Employees of the Employer who become unable to receive the entire amount of the accrued pension benefits to which they would be entitled under one or more of the pension plans sponsored by their Employer because of limitations established by Section 415 of the Internal Revenue Code. The Employer may be required and directed by the Board of Trustees of the Excess Benefit

25

Fund to contribute a portion of its agreed-upon "pension" contribution to the Section 415 Excess Benefit Fund and shall not increase the Employer's cost beyond the amount that the Employer is obligated to contribute to the Laborers' Pension Fund and that the funding of the Section 415 Excess Benefit Fund shall be fully tax deductible to the Employer for Federal Income Tax purposes. The Employer hereby agrees that the Board of Trustees of any such Section 415 Excess Benefit Fund shall be authorized to determine each year the amount that will be contributed by the Employer and the amount to be credited to the account of any eligible retiree for payment in lieu of accrued benefits that would exceed the limits set by Section 415 of the Internal Revenue Code.

**Paragraph 6. Chicagoland Laborers' Vacation Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Vacation Fund, a jointly-trusteed vacation plan established for the purpose of providing income to members during their winter lay-offs. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 7. Chicagoland Laborers' Annuity Fund.** The Employer agrees to be bound by the Agreements and Declarations of Trust, as well as any amendments thereto, establishing the Chicagoland Laborers' Annuity Fund, a jointly-trusteed defined contribution plan providing a supplemental retirement benefit. Contributions to the Fund will be allocated in the Union's sole discretion from the total economic increase.

**Paragraph 8. SUPERVISORS.** To the extent permissible by the Internal Revenue Service or any Federal Act, and for the purposes of Paragraphs 2 and 3 of Article VIII of this Agreement only, the bargaining unit shall also include those persons in the employ of an Employer who are supervisors, as defined in the Labor Management Relations Act, as amended; and who at one time were Employee members of the bargaining unit herein on

26

whose behalf contributions were required to be made to the trust funds described in the aforesaid Paragraph 2 and 3 of Article VIII hereof.

**Paragraph 9. OUT OF TOWN WORK.** When Laborers who reside or work in the nine-county geographic area covered by this Agreement are voluntarily requested to work at locations outside these nine counties, the Employer shall continue to report and pay benefits for all hours worked outside the nine counties. If the work performed is covered under a labor agreement with the Laborers' International Union of North America or its affiliates, the Employer shall report and pay the benefit contributions to the fringe benefit fund identified, and the contribution rates specified, under that labor agreement. If the work performed is not covered under a labor agreement with the Laborers' International Union of North America or its affiliates, then the Employer shall report and pay the benefit contributions to the fringe benefit funds identified, and the contributions rates specified, under this Agreement. No Employee shall be obligated to accept out of town employment or be subject to retaliation for refusing such work.

Where out of town work requires an overnight stay, the Laborer shall receive paid lodging plus $55 for meals and incidental expenses or the equivalent in accordance with an Employer's policy. Nothing herein shall restrict an Employer's ability to require compliance with its applicable travel related policies. This provision will take effect only for projects bid on or after June 1, 2021.

**Paragraph 10. SPECIAL RULES FOR BONDING.** An Employer that is owned or managed, in whole or part, by an individual who currently has or previously had in the last ten (10) years ownership or principal managerial responsibility for another contributing Employer that currently is or ceased doing business when delinquent to the Funds shall be required to post for the benefit of the Funds an additional cash bond or obtain a surety bond from a Fund-approved insurer in an amount equal to

27

twice the amount of the other contributing Employer's delinquency. This amount may be adjusted by the Benefit Fund Trustees for each individual Employer. This bond shall be in addition to and separate from the bond required elsewhere in this Agreement.

**Paragraph 11. WITHDRAWAL OF EMPLOYEES.** If the Employees are withdrawn from any job in order to collect contributions to the Laborers' Health and Welfare, Pension and/or Apprenticeship and Training Funds, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to remove Employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and the Union shall not pursue collection efforts from any other entity. This lost time liability shall not apply if the Employer has made payment on behalf of the affected Employees to another fringe benefit fund under a MARBA labor agreement or a labor agreement of a union affiliated with the Building and Construction Trades Department, AFL-CIO.

## ARTICLE IX
### BONDING

**Paragraph 1.** All Employers shall procure, carry and maintain a surety bond in form and amount satisfactory to the Union, but not less than in the principal sum of $5,000, to guarantee payment of wages, Pension and Welfare Trust contributions, during the term of this Agreement.

**Paragraph 2.** If the Employer employs between seven (7) and ten (10) Laborers, the surety bond shall be increased to $15,000. If the Employer employs eleven (11) and twenty (20) Laborers, the surety bond shall be increased to $25,000. If the Employer employs twenty-one (21) to forty (40) Laborers, the surety bond shall be increased to $35,000. If the Employer employs

28

forty-one (41) or more Laborers, the surety bond shall be increased to $45,000.

**Paragraph 3.** The Employer shall be required to obtain an appropriate bond upon contract execution, which bond may also be posted in cash. The trustees of the benefit funds, based on established guidelines or a contractor's payment history, shall have the discretion to adopt a policy that increases, reduces or eliminates the bonding requirements of this Article for those contractors the trustees deem appropriate for such increase, reduction or elimination. Should the Employer fail to comply with the provisions of this Article, the Union may withdraw its Employees or strike until such compliance occurs, and the Employer shall further be liable for all costs, including attorney's fees, incurred in enforcing these provisions.

**Paragraph 4.** The Employer shall give notice to the Union and the appropriate Fund Office in writing not later than ten (10) days after the occurrence of any of the following events relating to the Employer, occurring after the date hereof:

- (a) Formation of Partnerships;
- (b) Termination of business;
- (c) Change of name commonly used in business operation;
- (d) Change in form of business organization;
- (e) Incorporation of business;
- (f) Dissolution of corporation;
- (g) Name and business organization of successor;
- (h) Admission to or withdrawal from any association operating as a multi-employer bargaining unit.

**Paragraph 5. WITHDRAWAL OF EMPLOYEES.** If the Employees are withdrawn from any job in order to ensure compliance with the provisions this Article, the Employees who are affected by such stoppage of work shall be paid for lost time up to sixteen (16) hours, provided that two (2) days' written notice of intention to

29

remove Employees from the job is given to the Employer by the Union. These lost time amounts may be collected only from the contractor with whom the Union has a dispute and the Union shall not pursue collection efforts from any other entity. This lost time liability shall not apply if the Employer produces the required bond before expiration of the two-day notice period.

## ARTICLE X
### INDUSTRY FUND

**Paragraph 1.** Each Employer shall pay into the MID-AMERICA REGIONAL BARGAINING ASSOCIATION INDUSTRY ADVANCEMENT FUND (hereinafter sometimes referred to as the "Industry Fund"), or such other fund as MARBA may in its sole discretion designate at any time during the term of this Agreement, the amount of six cents ($0.06) for each hour worked for the Employer by those of his Employees who are covered by this Agreement.

Each Employer shall pay into the Chicago-Area Laborers-Employers Cooperation and Education Trust ("LECET"), the amount of seven cents ($0.07) for each hour worked for the Employer by those of his Employees who are covered by this Agreement.

Each Employer shall pay into the Laborers' District Council Labor Management Cooperation Committee ("LDC/LMCC"), the amount of seventeen cents ($0.17) for each hour worked for the Employer by those of his Employees who are covered by this Agreement.

Each Employer shall contribute one cent ($0.01) per hour for each hour worked by his/her Employees who are covered by this Agreement to the Construction Industry Service Corporation ("CISCO"), a not for profit corporation.

**Paragraph 2.** The Employer agrees to be bound by the Agreement and Declaration of Trust establishing the Industry Fund, as well as any amendments thereto, and

30

agrees to be bound by all actions taken by the Trustees of said Industry Fund pursuant to said Agreement and Declaration of Trust and amendments thereto. The Employer agrees to be bound by the Agreements and Declarations of Trust establishing the LECET and LDC/LMCC, as well as any amendments thereto.

**Paragraph 3.** Inasmuch as the existence and utilization of this Industry Fund should result in increased construction and, therefore, in increased construction job opportunities for Employees, the Union agrees to cooperate in assuring that the contributions required by this Article are in fact made by Employers bound by this Agreement.

**Paragraph 4.** For the period June 1, 2021 to May 31, 2026, each Employer shall contribute one cent ($0.01) per hour for each hour worked by his Employees who are covered by this Agreement to the Chicagoland Construction Safety Council, a not for profit corporation.

### ARTICLE XI
### PARTICULAR WORK RULES AND
### CLARIFICATION OF CONDITIONS

**Paragraph 1.** (a) Building Laborers' scale shall apply to all work performed by the Laborers except as specifically classified.

(b) Boiler Setter Laborers. Will include all work of handling solid refractory materials and also fire brick work in boiler setting, open hearth, furnace, blast furnace, soaking pits, tanks, dust catchers, coke oven batteries, furnace chimneys and stacks, including cleanup work on the above services.

(c) Boiler Setter Plastic Laborers. Applies to work of actually installing plastic, in connection with the boiler work or other non-solid refractory materials. Mortar mixers, lancers, burners, etc., plus all work from point of forty (40) feet above normal ground level in fire brick work and Boiler Setters Laborers' Classifications.

31

Minimum safety measures for Boiler Setters are that all scaffolding, in and around blast furnaces and hot stoves, etc., shall not exceed five (5) feet per landing and be constructed of solid-type materials, except the large cable-type used in blast furnaces, and at least every fourth scaffold shall be left in place to serve as a safety scaffold with ladders extending to safe distance above each landing. The Employer shall furnish respirators, safety goggles, gloves and other protection materials necessary in and about dusty and hot working conditions during all furnace work.

(d) Caisson Diggers. Applies to all caisson work and men working in trenches, foundation pits and piers eight (8) feet or more in depth below the level that excavation begins in such trenches, foundation pits or piers.

Where hazardous conditions exist when excavating trenches, foundation pits or piers or where a type of soil, sand or other material being removed creates a hazardous condition for the Employee such trenches, foundation pits or piers must be shored or sheathed, and the Employees performing the work of shoring and sheathing shall be paid the caisson rate.

Where hazardous conditions do not exist, but sheathing or shoring is necessary solely for the purpose of protecting a bank or preserving the work, then caisson rates shall not apply. When specifications show the depth of such excavation to exceed eight (8) feet, said caisson rate shall apply from the start of excavation when hand dug. For safety reasons, no worker shall be permitted to work alone if excavation exceeds five (5) feet, unless he is working under direct supervision.

(e) Chimney Laborers (over forty (40) feet). Applies to all freestanding chimneys in excess of forty (40) feet above the ground level. The Chimney Laborers' rate shall apply for the entire height of the chimney, both erecting or wrecking such chimney.

Free-standing chimneys shall be construed as chimneys built from the ground up, outside the building, for industrial, commercial or institutional purposes. It is understood that this provision does not apply in the erection of ordinary chimneys for apartment buildings, etc., unless the chimneys go forty (40) feet above the roof level.

(f) Jackhammermen. The rate for Jackhammermen herein established shall apply to any mechanically operated tool over thirty-five (35) pounds in weight, used in demolition, concrete breaking, tamping or other similar work. The regular building Laborers' rate shall apply to all lighter mechanical tools.

(g) Scaffold Laborers. Applies to all Laborers engaged in installing, relocating and/or removing all swinging, tubular and other types of scaffolds designed and used for tending to or servicing our allied trades. The raising and lowering of swinging and specifically designed scaffolds by hand, by power, or by any other process, is not included in scaffold Laborers' rates.

(h) Stone Derrickmen and Handlers. Applies to all Laborers engaged in helping the stone setters set and distribute dimensional cut stone, terra cotta, granite or prefabricated materials replacing or substituted for cut stone, etc.

(I) Windlass and Capstan Persons. Applies to all hoisting units attached to mixers or movable equipment used to raise material where regular hoists cannot be erected or used.

(j) Fireproofing and Fire Shop Laborers. Applies to Fireproofing beams, ceilings and walls, etc., in connection with gunite work or any other process, including clean-up work on job site, shops or yards.

(k) Cement Gun Nozzle Laborers (Gunite). Applies to Laborers handling nozzle in application of gunite.

33

(l) Cement Gun Laborers. Applies to Laborers handling cement gun on concrete work.

(m) Plasterer Laborers. Applies to all Laborers who perform work as mixermen, hod carriers, plaster machine tenders, and builders of scaffolding, and all work pertaining to lathing and plastering, the application of gunite and the handling of the cement gun nozzle or any work of a thickness of one and one half (1½) inches or more and any work as may be directed by the contractor his agent or foreman.

(n) Laborers who are engaged in the work of construction or wrecking of silos, etc., for grain elevators, and are required to strip or wreck forms at hazardous heights in this work shall be paid chimney Laborers' rates.

(o) On salamander work or heating for frost prevention work, the building Laborers' rates of wages shall apply for the first eight (8) hours' work regardless of starting time Monday through Friday of each week. All hours worked on Saturday, Sunday or Holidays, and all hours worked after eight (8) hours per day, or forty (40) hours per week Monday through Friday, as above set forth, shall be paid for at one and one-half times the Building Laborers' rate of wages.

(p) Where services are performed by Laborers as watchmen, and such Laborers shall not be engaged in the performance of any other branches of work covered by this Agreement, they shall be paid not less than $1.50 below the Building Laborers' rate.

(q) **Foremen**. There shall be a Laborer appointed as Labor Foreman when five (5) or more Laborers are employed on any one job or project; there shall be sub-foreman after the first ten (10) Laborers, and for each multiple of five (5) Laborers employed thereafter to properly supervise the various phases of the work. A Sub-Foreman shall receive $0.45 premium wages above the regular wages paid those Laborers under his supervision, plus established overtime rates. When a Labor Foreman is

34

needed to supervise Laborers such Labor Foreman shall receive $0.75 or more premium wages above top labor scale, as mutually agreed between said Labor Foreman and his Employer.

The above and foregoing shall not be so construed as to restrict the Employer's right to pay higher premium wages or appoint a greater percentage of foremen and/or sub-foremen.

(r) The Employer shall furnish any necessary protective medication, such as petroleum jelly, to prevent burns from creosote or chemicals which may prove injurious to the skin.

(s) On a job site requiring a Tool Shanty, said Tool Shanty shall be tended by a Laborer if Employer determines tending is required.

(t) Portable Water Pumps shall be tended by Laborers if Employer determines tending is required.

(u) In any instance where a machine replaces only the work of Laborers, said machine shall be operated by a Laborer if so determined by the Employer.

(v) Any building 125 feet high or more shall require the use of a Man Cage.

**Paragraph 2.** Wages must be paid by payroll check and shall include a stub or statement showing the number of straight time and overtime hours worked and rate of pay. Failure on the part of the Employer to have sufficient funds at the bank to meet pay checks issued workers, shall deprive such Employers henceforth from the right to pay by checks and Joint Grievance Committee shall assess such Employer a sum equal to not less than the expense incurred in the collection of the amounts due because of such insufficient funds to meet checks so issued.

**Direct Deposit.** In lieu of paying wages by payroll check, the Employer may make payment by electronic bank draft if the Employee voluntarily accepts such alternate method of payment. The Employer shall not man-

35

date electronic banking as a condition of employment. Electronic wage payments must be transferred to the Employee's bank account no later than the Employee's regular pay day and at no cost to the Employee. If payment is made by electronic bank draft, the Employee must also be provided a record of hours worked, rates of pay, and deductions made, at the same time and containing the same information as if wages were paid by payroll check.

If full wages are not timely transferred to the Employee's account, the Employer shall pay the Employee an additional four (4) hours' pay for each day or portion thereof until full wages are received. Employers who violate the provisions of these paragraphs shall be denied the use of electronic banking for wage payments.

**Paragraph 3.** The Union agrees that the Employees whom it represents will accept and demand the wages and fringe benefit payments set forth in this Agreement, and the Employer agrees to pay the wages and fringe benefit payments herein stipulated.

Claims for Shortages: Claims by Employees for shortages must be made within three (3) weeks after shortage is discovered.

**Paragraph 4. LIQUIDATED DAMAGES.** Payment by the Employer and acceptance by the Employee of less than the wage herein stipulated shall be a violation of this Agreement upon the part of each. Upon conclusive proof to the Joint Grievance Committee of such violation, the Employer shall immediately pay the unpaid balance due in accordance with the wage herein stipulated; and in addition thereto, shall pay as directed by the Joint Grievance Committee an amount no less than fifty percent (50%) of the amount of such pay shortage as just and liquidated damages because of such violation. In cases where an Employee was knowingly complicit in the underpayment of wages, none of the liquidated damages assessed against the Employer shall be awarded to that Employee.

36

Upon conclusive proof that the Employer is guilty of paying less than the wages herein stipulated, then nothing in this Agreement shall be construed to take from the Union the right to remove workers it represents from the job, and henceforth to deny such Employer further right to the employment of its members.

Members of the Union who are found guilty of violation of this Agreement shall be dealt with by the Employer.

**Paragraph 5.** The Union reserves and shall have the right to remove its Employees from any job upon the failure of the Employer to pay the wages due any of its Employees or fringe benefits which may be due by reason of the hours of employment.

**Paragraph 6.** The Employer hereby agrees to maintain proper temporary toilet and drinking facilities accessible to all Employees on the job. The Employer also agrees that it will ice the water at the start of each shift.

**Paragraph 7.** The Employer shall furnish a suitable place, properly heated when reasonably necessary, where Laborers may eat and change their clothes.

**Paragraph 8. HIRING HALL.** No agreement on the request of the Union for the establishment of an exclusive Hiring Hall has been consummated. Therefore, the question of establishing a Hiring Hall is hereby reserved for the future consideration of the parties. Upon service of sixty (60) days' notice in writing upon Employer from Union, such question shall be taken up for discussion and further negotiation by the parties hereto.

**Paragraph 9. KEY MAN.** The Employer may utilize no more than one (1) Laborer at a job site as its key man who resides outside the geographic area covered by this Agreement. This limitation shall not apply to any Laborer who works regularly and continuously within the geographic area covered by this Agreement. Exceptions can be made with the parties' mutual agreement in order to obtain reciprocal arrangements with other jurisdiction.

**Paragraph 10. PUBLIC HEALTH EMERGENCIES.**
In any county or portion thereof covered by this Agreement, if the Illinois Governor declares a public health emergency, and for the duration thereof, the Employer shall abide by recommendations from the Centers for Disease Control and Prevention (CDC) and the Illinois Department of Public Health (IDPH), and all applicable laws and regulations, for construction worker health and safety. If the Employer fails to timely comply with such requirements after notice from and discussion with the Union (including the District Council if requested), the Union may withdraw employees from any worksite not in compliance herewith.

### ARTICLE XII
### STEWARDS

**Paragraph 1.** The parties agree that the following basic principles apply to the selection of a Job Steward:

1) The Union requires that a Steward must fully protect the interest of the Union.

2) The Employer requires that the Steward be a Laborer who can efficiently perform his duties as a Laborer and will not disrupt the job unnecessarily in discharging his duties as a Steward.

3) To meet the two basic principles agreed to by the parties, it is further agreed:

a) The Job Steward shall be a working Laborer;

b) The Steward shall be selected by the Business Manager of the Union with jurisdiction over the job;

c) In selecting a Steward, preference shall be given to the Union members presently employed in the bargaining unit of the Employer on the specific site, provided, however, that if, in the judgment of the Business Manager, no presently employed Union member is competent to act as Steward,

38

the Steward shall be selected from outside the bargaining unit. A reason shall be given by the Business Manager why no member is competent. However, the reason shall not infringe upon the right of the Business Manager to select the Steward; and

d) The Union shall have the right to replace any Steward at any time.

**Paragraph 2.** The Steward shall be subject to the same terms of employment as any other Employee, but taking into consideration that the Steward should be present during all working hours, all possible overtime work shall be assigned to all Stewards, if the Stewards do not replace another Laborer from that other Laborers' previously assigned duties.

**Paragraph 3.** The duties of the Steward shall include the checking of terms and conditions of work, safety conditions, starting dates of employment for new Laborers, whether Union or non-union, and report same to the Business Manager who appointed him. All Laborers employed on a job or project shall report to the Steward any differences of disputes which may arise in connection with the work or any part of it, and the Steward shall report same to the office of the Union. If it becomes necessary to discharge or lay off any Laborers because of completion of the work or otherwise, the Laborers appointed and acting as Steward shall not be discharged or laid off while other Laborers employed by the Steward's employer remain employed on the job or project as long as he is competent to perform the work. Nothing herein contained shall in any way restrict the right of any Employer to discharge a Steward for cause, upon notification to the Business Manager of the Local Union who appointed the Laborer to act as Steward.

**Paragraph 4.** Whenever one or more Laborers are required to work overtime, one of these Laborers shall be the regular designated Steward if he is competent to do the work required or if he cannot work, he will call the

39

Business Manager, and the Business Manager will desig-
nate someone on this job to act as Steward.

### ARTICLE XIII
### REPORTING FOR WORK

**Paragraph 1.** Any Laborer reporting for work upon
order expressed or implied by the Employer or his Agent
and not put to work for any reason, except weather con-
ditions, fire, accident or other unavoidable cause, shall
receive four (4) hours' pay for lost time. Weather condi-
tions shall be an exception to the requirement for "show
up" or reporting pay provided the Employer has notified
the Employee by telephone or has required in writing that
the Employee call before he departs from home. The
Employer must provide a definite and available phone
number and must post this provision on each job site.
When Laborers are directed to wait during inclement
weather by the Employer, his Superintendent or Labor
Foreman, they shall be paid for such waiting time.

When placing monolithic concrete, an Employee's
eating period can be adjusted, but not beyond one-half
(½) hour before or after the regular scheduled time.
Double time shall be paid if no eating period is permitted
between shifts.

Any person other than a regular Employee who is
called for temporary work for just a portion of one day,
and who works more than four (4) hours in any one day,
shall receive equivalent of not less than eight (8) hours'
pay for said day, unless such Employee is prevented from
completing a day's work because of inclement weather, in
which case the Employee shall be paid for the time actu-
ally worked.

**Paragraph 2.** In case of an accident requiring med-
ical attention during working hours, Laborers shall be
permitted to go for or be taken for medical attention at
once, and shall be paid for lost time that day.

40

In the event such injured Laborer is permitted to continue working by the doctor, but is required to return for periodic medical attention during working hours by the insurance physician or company doctor, such injured Laborer shall be paid for lost time, but not to exceed two (2) hours' pay for such visit to the doctor.

**Paragraph 3.** The Employer agrees that no punitive action shall be taken against their Employees, if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

## ARTICLE XIV
## PAYDAY

**Paragraph 1.** It is agreed that Employees shall be paid before quitting time on Wednesday of each week, except when the regular payday is on a Legal Holiday, in which case they shall be paid the day before such holiday at quitting time and except when Monday or Tuesday is a legal holiday, in which event the Employees may be paid on Thursday.

**Paragraph 2.** Wages are to be paid in full up to seventy-five (75) hours preceding payday. An Employee quitting of his own accord shall be paid on the next regular payday. An Employee discharged or laid off shall be paid by check on the job at the time he is laid off or be given a time check calling for four (4) additional hours to cover traveling time. Such additional hours are to be added at the time of giving check and shall be paid on presentation at the office of the Employer. If same is not promptly paid upon arrival at the office, and he is required to remain there during working hours, he shall be paid for such time - Sundays and Holidays excepted.

## ARTICLE XV
## TRAINING AND
## APPRENTICE PROGRAM

**Paragraph 1. APPRENTICE COMMITTEE. MARBA** and the Union shall create a Joint Apprenticeship

41

Training Committee (JATC), consisting of three (3) management and three (3) Union appointees to draft a trust agreement, hire staff, develop apprenticeship standards and oversee implementation of the apprentice program. The Employer hereby adopts and shall be bound by the agreement and declaration of trust established by the JATC for the apprentice program, together with any amendments thereto, which are incorporated by reference herein. The JATC shall have authority to set and enforce penalties for violations of the apprenticeship rules.

**Paragraph 2. APPRENTICESHIP AND TRAINING FUND.** The Employer shall contribute ninety cents ($0.90) per hour for each hour worked from June 1, 2021 to May 31, 2022 for all Employees covered under this Agreement to the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund payable to the Training Fund or a designated appointee at the end of each month and such additional sums as the Union may designate in its sole discretion from its total economic package on June 1, 2022, June 1, 2023, June 1, 2024 and June 1, 2025 under this Agreement. The terms of the trust establishing the Fund are incorporated by reference herein and all terms regarding auditing, assessment, non-payments and grace periods as set out in the Collective Bargaining Agreement regarding payment of Welfare and Pension Fund contributions shall apply as if fully set forth herein for the Construction and General Laborers' District Council of Chicago and Vicinity Apprenticeship and Training Fund.

**Paragraph 3.** The term of apprenticeship shall be 2,400 hours, or two years, whichever occurs later, or such other duration as is mutually agreed by the Training and Apprenticeship Fund trustees. All Health and Welfare, Pension, Training Fund, Industry Advancement and other contributions required under this Agreement will commence immediately upon employment of an apprentice. Union affiliation will be required after seven (7) days of employment.

42

**Paragraph 4.** The wages per hour paid to apprentices shall be as follows:

| | |
|---|---|
| 1st six (6) months | 60% of journeyman (base) wages |
| 2nd six (6) months | 70% of journeyman (base) wages |
| 3rd six (6) months | 80% of journeyman (base) wages |
| 4th six (6) months | 90% of journeyman (base) wages |
| After twenty-four (24) months | 100% of journeyman (base) wages |

**Paragraph 5.** The ratio of journeymen to Apprentices shall be six (6) Laborer journeymen to one (1) Laborer apprentice on a company-wide basis, with no more than twenty percent (20%) of Laborers being apprentices on any one job site of the Employer.

Employers who employ a maximum of between one (1) and five (5) Laborer journeymen shall be entitled to one (1) Laborer apprentice, who may be assigned to job-sites irrespective of the twenty percent (20%) job site maximum specified in this provision.

**Paragraph 6.** Referral of apprentices will be through the Local Union with jurisdiction over the job site. Employers requesting apprentices will be assigned an apprentice by the JATC from the available apprentice pool. The JATC can limit the number of apprentices to that which is adequate for current needs and which can be properly trained by the program. Employers may recall their laid off apprentices to work, provided that the Employer complies with the ratios set forth in Paragraph 5. All apprentices must report their hours weekly to the JATC. All apprentices will be required to undergo testing by the JATC for the presence of illegal substances at the time they enter the apprentice program.

**Paragraph 7. MANDATORY APPRENTICESHIP.** Under the terms described below, all inexperienced Laborers employed under this Agreement shall enter the trade as apprentices. The Joint Apprenticeship Training Committee shall establish the rules and procedures to implement this mandate no later than January 1, 2019.

43

The mandatory apprenticeship terms shall include the following:

1. Employers shall be allowed to employ the individuals of their choice for apprenticeship, up to the maximum ratios in the Agreement, provided those individuals fulfill the conditions and requirements of the apprentice program. No Employer shall be refused sponsorship of an eligible apprenticeship applicant due to lack of openings in the apprenticeship program. There shall be no limit to the number of apprentices an employer can sponsor provided however that the employer shall not exceed the employment of apprentice ratios contained in the Agreement.

2. Other terms of employment for apprentices shall be as set forth in this Article unless otherwise agreed by the JATC.

### ARTICLE XVI
### SETTLEMENT OF DISPUTES

**Paragraph 1.** Any dispute concerning the interpretation or application of this Agreement between an Employer and the Union shall be adjusted by the particular Employer and Union, in the first instance. Jurisdictional disputes (that is, competing claims for the assignment of work) are not subject to being processed through this grievance procedure.

**Paragraph 2.** In the event that the matter is not settled, the Union may file a written grievance, which shall be submitted to a Joint Grievance Committee (hereinafter the "JGC") comprised of three (3) Employer representatives selected by MARBA and three (3) Union representatives selected by the Construction and General Laborers' District Council of Chicago and Vicinity, which shall convene monthly. The JGC shall adopt its own rules of procedure. The Union must file the grievance within forty-five (45) days of the date of the occurrence giving rise to the grievance or when the affected Employee knew or rea-

44

sonably should have known of the existence of the grievance. Grievances not filed within the forty-five (45) day period are deemed waived and are not subject to being processed through this procedure. The determination of the JGC shall be governed by majority vote, provided that the Employer representatives and Union representatives shall have equal voting power. If decided by majority vote, the grievance determination and any relief determined to be appropriate shall be final and binding upon all parties.

Laborers who prevail in their grievances shall be compensated for two (2) hours lost time to attend the JGC Grievance hearing. Grievances shall be dismissed if the grievant fails to appear at the scheduled hearing and no continuance is granted by the JGC.

**Paragraph 3.** In the event that the JGC is deadlocked upon the disposition of a grievance, then the Union or the Employer may refer the matter to arbitration by so notifying the other within thirty (30) days of the date of the JGC decision. The moving party shall obtain a list of seven (7) arbitrators from the Federal Mediation and Conciliation Service, provided that all arbitrators maintain their principal office in the Chicago area. The party selected by lot shall strike the first name from the list, then parties shall alternately strike names from the list until one arbitrator remains.

Grievances alleging a violation of Article I of this Agreement shall be initiated with the designated company official and may be processed under the grievance procedure contained herein or advanced directly to arbitration at the discretion of the Union. Such grievances shall be subject to the same forty-five (45) day time limitation as provided under this Article. In the event the Union elects to proceed directly to arbitration over a grievance concerning a violation of Article I of this Agreement said grievance must be referred to an arbitrator within thirty (30) days from the date of filing. The parties to the grievance may agree to extend the time in which the grievance

45

is to be referred to an arbitrator by written mutual agreement. If the Union does not timely elect to proceed directly to arbitration of the grievance, the grievance shall be heard by the JGC and the process set forth in paragraphs 2 and 3 above shall apply.

**Paragraph 4.** The decision of the arbitrator shall be final and binding upon all parties. The arbitrator shall not be empowered to amend, alter or add to this Agreement. The arbitrator's expenses shall be jointly paid by the Employer and the Local Union between whom the grievance exists.

**Paragraph 5.** Any party who fails to comply with an award within seven (7) days' notice of an arbitrator's award or the JGC determination shall be responsible for an additional ten percent (10%) liquidated damages on any monetary award and all court costs and reasonable attorney fees actually incurred by the party enforcing the award.

**Paragraph 6.** With regard to this Article, the Union reserves its right, and it shall not be a violation of this Agreement, for the Union to strike, picket and/or withdraw its Employees from any Employer who fails to pay wages or fringe benefits as required under this Agreement. Except as provided in this Article, there shall be no strike, slowdown, withdrawal of men or other concerted refusal to work by the Union or the Employees during the term of this Agreement. Further, there shall be no lockout by the Employer. The Employer further agrees that no punitive action shall be taken against its Employees if said Employees refuse to cross a picket line that may be placed on the job or project of their Employer.

**Paragraph 7. WAGE AUDITS.** Where the grievance concerns wages that are reflected in a wage audit showing a pattern or practice of wage underpayment, the grievance must be filed within forty-five (45) days after the Union's receipt of the audit. The recovery of any wages shall be limited to the two-year period preceding the grievance filing date (or three (3) years if so determined

for cause by the Joint Grievance Committee). In cases where an Employee was knowingly complicit in the underpayment of wages, that Employee shall be limited to receiving unpaid wages from the last forty-five (45) days and the additional amounts assessed against the Employer shall first be paid to defray the audit costs and thereafter as directed by the Joint Grievance Committee.

## ARTICLE XVII
## BRANCHES OF WORK

**Paragraph 1.** The classifications of Employees covered by this Agreement doing the work falling within jurisdiction of this Union shall be used in performing all common labor at the building or site, in connection with masonry and carpentry or such other work as may be directed by the Employer, his foreman or agent.

**Paragraph 2.** The Employer shall not engage his labor on a piece-work basis.

**Paragraph 3.** The Employer shall furnish all tools and shovels required for the work, also boots and rain equipment required for the protection of the workers in the trade and the worker shall be held responsible for same.

**Paragraph 4. RECOGNITION OF BARGAINING REPRESENTATIVE.** Employer hereby agrees to recognize the Union as the exclusive representative of all its Employees performing work within the jurisdiction of the Union for the purpose of collective bargaining in respect to rates of pay, wages, hours of employment, and also confirms the jurisdiction of this Union over the branches of work covered herein, and agrees not to enter into any agreement with other labor organizations covering such branches of work.

In the event of a jurisdictional dispute over any of the work covered under this Agreement that cannot be adjusted by both parties to this Agreement and the contending party, and if a binding authority recognized by the Union determines the work to be definitely the jurisdiction of some other union, then the parties shall jointly

47

abide by such determination; provided that in the event the decision is appealed by the Union, this provision shall not be applicable until such time as the final decision issues.

**Paragraph 4(a). BRANCHES OF WORK COVERED HEREIN.** The building of all scaffolding, runways and windbreaks for concrete and mason work, rigging for caissons and concrete chutes and hoppers, digging, lagging, sheeting and dewatering of foundation piers and caissons; concrete work within the walls of any building or jobs; the rubbing and grinding of concrete installations where no patching is involved; boxing for concrete footing, raising, moving, shoring of all buildings, back fillings and gradings; also all laboring work in connection with cement sidewalks, curbs or gutters, stone curbs, streets, alleys, driveways, viaducts, retaining walls, slate, tile and asbestos roofing; also all laboring work connected with composition floor work, rock asphalt, whether done by hand or by any other process, wrecking and stripping of concrete forms and false work, tending to carpenters, tending to salamanders; removal, clearing and cleaning of all debris, signalman and handling of such materials for construction as directed by the Employer; also building in centering for fire proofing; gunite work in handling of cement gun nozzle, when gunite is applied of a thickness of one and one-half (1½) inches or more, all laboring work in connection with original installation of landscaping in connection with new construction of all types, also all laboring work in connection with boiler setting, including the installation of plastic or other non-solid refractory materials. The coverage of this agreement, in referring to the type of work hereunder, includes in addition to all other types of construction, the construction and alteration of all track work and the construction, alteration and maintenance over track work on property on which a railroad company does not have a property right; in short, all unskilled labor connected with work undertaken by members of the Employer and the handling of all materials, or appliances in any trade where it

48

will be more economical to have the work done by Laborers as may be decided by the Employer, subject to appeal to the decision of the Joint Grievance Committee.

**Tenders.** Tending masons, plasterers, carpenters and other building and construction crafts. Tending shall consist of preparation of materials and handling and conveying of materials to be used by mechanics or other crafts, whether such preparation is by hand or any other process. After the material has been prepared, tending shall include the supplying and conveying of said material, and all other materials to such mechanic, whether by silo mixer, bucket, hod, wheelbarrow, buggy, or any motorized unit used for such purpose, bobcats, and uniloaders for cement masons and concrete contractors, forklifts for brick masons and/or any other machine which replaces the wheelbarrow or buggy.

Unloading, handling, and distributing of all materials, fixtures, furnishings, furniture, and appliances whether crated or uncrated from point of delivery to stockpiles and from stockpiles to approximate point of installation.

Drying of plaster, concrete, mortar or other aggregate when done by salamander heat or any other drying process.

Cleaning and clearing of all debris and recycled material, including wire brushing of windows, scraping of floors, removal of surplus material from all fixtures within confines of structures and clearing of all debris in building and construction area. The general cleanup, including sweeping, cleaning, washdown and wiping of construction facility, equipment and furnishings and removal and loading or burning of all debris including crates, boxes, packagings, and packaging waste materials. Washing or cleaning of walls, partitions, ceilings, windows, bathrooms, kitchens, laboratory, and all fixtures and facilities therein. Cleanup, mopping, washing, waxing and polishing or dusting of all floors or areas.

The aging and curing of concrete, mortar and other materials applied to walls, floors, ceilings and foundations of buildings and structures, highways, airports, overpasses, tunnels, bridges, approaches, viaducts, ramps, or other similar surfaces by any mode or method.

All fire watch, hole watch, and confined space entry watch for the above-mentioned craft. Firestopping, fireproofing beams, ceilings, walls and floors with all forms of fire prevention materials.

Safety and deck monitoring.

**Scaffolds.** Erection, planking, maintenance and removal of all scaffolds and windbreaks for lathers, plasterers, bricklayers, masons and other construction trade crafts. Building planking or installation and removal of all staging, swinging, tubular and hanging scaffolds, including maintenance thereof.

**Excavations and Foundation-Site Preparation and Clearance For Transportation and Transmission Lines.** Excavation for building and all other construction; digging of trenches, piers, foundations and holes; digging, lagging, sheeting, cribbing, bracing and propping of foundations, holes, caissons, cofferdams, dams, dikes and irrigation trenches, canals and all handling, filling and placing of sand bags connected therewith. All drilling, blasting and scaling on the site or along the right of way, as well as access roads, reservoirs, including areas adjacent or pertinent to construction site; installation of temporary lines.

Preparation and compacting of roadbeds for railroad track laying, highway construction and the preparation of trenches, footings, etc., for cross-country transmission by pipelines or electric transmission or underground lines or cables.

On-site preparation and right-of-way clearance for construction of any structures or the installation of traffic and transportation facilities such as highways, pipelines, electrical transmission lines, dam sites and reservoir areas, access roads, etc. Clearing and slashing of brush or

50

trees by hand or with mechanical cutting methods. Blasting for all purposes such as stumps, rocks, general demolition. Falling, bucking, yarding, loading or burning of all trees or timber on construction areas. Choker setters, off-bearers, lumber handlers and all Laborers connected with on-site portable sawmill operations connected with clearing. Erection, dismantling and/or reinstallation of all fences. Cleanup of right-of-way, including tying on, signaling, stacking of brush, trees or other debris, and burning where required. All soil tests, operations of semi and unskilled labor, such as filling of sand bags, handling timber and loading and unloading of same; all GPS equipment and lasers and grade checking.

**Concrete, Bituminous Concrete and Aggregates.** (a) Concrete, bituminous concrete or aggregate for walls, footings, foundations, floors or for any other construction. Mixing, handling, conveying, pouring, vibrating, guniting and otherwise placing concrete or aggregate, whether done by hand or any other process. Wrecking, stripping, dismantling and handling concrete forms and false work. Building of centers for fire proofing purposes. Operation of motorized wheelbarrows or buggies or machines of similar character, whether run by gas, diesel or electric power. When concrete or aggregates are conveyed by crane or derrick, or similar methods, the hooking on, signaling, dumping and unhooking the bucket. Placing of concrete or aggregates, whether poured, pumped, gunited, or placed by any other process. The assembly, uncoupling of all connections and/or parts of, to equipment used in mixing or conveying concrete, aggregate, or mortar, and the cleaning of such equipment, parts and/or connections. All vibrating, grinding, spreading, flowing, rodding, leveling and strike-off of concrete or aggregates by floating, puddling or screening by hand or mechanical means prior to finishing. Where prestressed or pre-cast concrete slabs, walls, or sections are used, all loading, unloading, stockpiling, hooking on, signaling, unhooking, setting and barring into place of such slabs, walls or sections. All mixing, handling, conveying,

51

placing and spreading of grout for any purpose. Green cutting of concrete or aggregate in any form, by hand, mechanical means, grindstones or air or water.

(b) The filling and patching of voids, crevices, etc., to correct defects in concrete caused by leakage, bulging, sagging, etc.

(c) The loading, unloading, carrying, distributing and handling of all rods, mesh and material for use in reinforcing concrete construction. The hoisting of rods, mesh and other material for use in reinforcing concrete construction. The hoisting of rods, mesh and other materials except when a derrick or outrigger by other than hand power is used.

(d) All work on interior concrete columns, foundations or engine and machinery beds.

(e) The stripping of forms, other than panel forms which are to be re-used in their original form, and the stripping of forms on all flat arch work.

The moving, cleaning, oiling and carrying of all forms to the next point of erection.

The snapping of wall ties and removal of tie rods. Handling, placing and operation of the hoses and pots or hoppers on sand blasting or other abrasive cleaning. The jacking of slip forms, and all semi and unskilled work connected therewith.

**Streets, Ways and Bridges.** Work, in the excavation, preparation, concreting, asphalt, bituminous concrete and mastic paving, ramming, curbing, flagging and surfacing of streets, striping, street markings and other pavement markings. Laborers engaged in layout work, cleanup and helping painters involved in any pavement markings, ways, courts, underpasses, overpasses, bridges, approaches and slope walls and the grading and landscaping thereof and all other labor connected therewith. Cleaning, grading, fence or guard rail installation and/or removal for streets, highways, roadways, aprons, run-

52

ways, sidewalks, parking areas, airports, approaches and other similar installations. Preparation, construction and maintenance of roadbeds and sub-grade for all paving, including excavation, dumping and spreading of sub-grade material, ramming, or otherwise compacting. Setting, leveling and securing or bracing of metal or other road forms and expansion joints, including placing of reinforcing mats, or wire mesh, for the above work. Loading, unloading, placing, handling and spreading of concrete aggregate or paving material, including leveling of the surface. Strike-off of concrete, when used as paving material by hand and floating or mechanical screening for strike-off. Cutting of concrete for expansion joints and other purposes. Setting of curb forms and the mixing, pouring, cutting, flowing, and strike-off of concrete used therefor. The setting, leveling and grouting of all pre-cast concrete or stone curb sections. Installation of all joints, removal of forms and cleaning, stacking, loading, oiling and handling. Grading and landscaping in connection with paving work. All work in connection with loading, unloading, handling, signaling, slinging and setting of all paving blocks, riprap or retaining walls such as stone, wood, metal, concrete or other material and the preparation of surfaces to receive same.

**Concrete and Asphalt Testing and Quality Control.** All work in connection with quality assurance/quality control and the collection and testing of construction materials and soil samples for the purposes of quality control/quality assurance. (Concrete and Asphalt Testing and Quality Control shall not be subject to the subcontracting restrictions in Article VII).

**Trenches, Manholes, Handling and Distribution of Pipe, Etc.** Cutting of streets and ways for laying of pipe, cables or conduits for all purposes; digging of trenches, manholes, etc., handling and conveying all materials; concreting, back-filling, grading and resurfacing and all other labor connected therewith. Clearing and site preparation as described herein. Cutting or jackhammering of streets, roads, sidewalks or aprons by hand or the use of air or

other tools. Digging of trenches, ditches and manholes and the leveling, grading and other preparation prior to laying pipe or conduit for any purpose. Loading, unloading, sorting, stockpiling, wrapping, coating, treating, handling and distribution of water mains to the first joint from the building, gas mains, and all pipe, including placing, setting and removal of skids. Cribbing, driving or sheet piling, lagging and shoring of all ditches, trenches and manholes. Handling, mixing or pouring concrete and handling and placing of other materials for saddles, beds or foundations for the protection of pipes, wires, conduits, etc. Backfilling and compacting of all ditches, resurfacing of roads, streets, etc. and/or restoration of lawns and landscaping.

**Shafts and Tunnels, Subways and Sewers.** Construction of sewers, shafts, tunnels, subways, caissons, cofferdams, dikes, dams, levies, aqueducts, culverts, flood control projects and airports. All underground work involved in mines, underground chambers for storage or other purposes, tunnels or shafts for any purpose, whether in free or compressed air. Drilling and blasting, mucking and removal of material from the tunnels or shafts. The cutting, drilling and installation of material used for timbering, or retimbering, lagging, bracing, propping or shoring the tunnel or shaft. Assembly and installation of multiplate, liner plate, rings, mesh, mats or forms for any tunnel or shaft including the setting of rods for same. Pouring, pumps-creting or guniting of concrete in any tunnel or shaft operation, manual or hydraulic jacking of shields and the use of such other mechanical equipment as may be necessary.

Excavation or digging and grading of footings and foundations for bridges, overpasses, underpasses, aqueducts, etc., and their approaches. All concrete work as described above and in addition, the hooking on, signaling and dumping of concrete for treme work over water on caissons, pilings, abutments, etc. Excavation, grading, grade preparation and landscaping of approaches. Installation of pipe, gratings and grill work for drains or

54

other purposes. Installation of well points or any other dewatering system.

**Compressed Air.** In compressed air all work underground or in compressed chambers, including tending of the outer air lock. All work in compressed air construction including, but not limited to, groutmen, trackmen, blasters, shield drivers, miners, brakemen, miner's helpers, lock tenders, mucking machine operators, mortar men, gauge tenders, rodmen, compressed air electricians, setting of line plate and ring sets, drill runners, powermen or blasters, air hoist operators; form men; concrete blower operators, cement (invert) operators, power knife operators, erector operators, keyboard operators, pebble placer operators, car pushers, grout machine operators, steel setters, cage tenders, skinner track layers, dumpmen, diamond drillers, timbermen and re-timbermen, cherry pickmen, nippers, chucktenders and cable tenders, vibratormen, jetgunmen, gunite, nozzlemen, gunmen, reboundmen and all other work connected therewith.

**Sewer, Drains, Culverts and Multiplate.** Unloading, sorting, stockpiling, wrapping, coating, treating, handling, distribution and lowering or raising of all pipe or multiplate. All digging, driving of sheet piling, lagging, bracing, shoring and cribbing, breaking of concrete, backfilling, tamping, resurfacing and paving of all ditches in preparation for the laying of pipe. Pipe laying, leveling, and making of the joint of any pipe used for main or side sewers and storm sewers. All of the laying of clay, terra cotta, iron-stone, vitrified concrete or other pipe and the making of joints for main or side sewers and storm sewers and all pipe for drainage. Unloading, handling, distribution, assembly in place, bolting and lining up of sectional metal or other pipe including corrugated pipe. Laying of lateral sewer pipe from main sewer or side sewer to building or structure, except that Employer may direct that this work be done under proper supervision. (Referee Hutcheson's decision). Laying, leveling and making of the joint of all multi-cell conduit or multi-purpose pipe. Cutting of holes in walls, fittings, piers or other obstruc-

55

tions for the passage of pipe or conduit for any purpose and the pouring of concrete to secure said holes. Digging under streets, roadways, aprons or other paved surfaces for the passage of pipe, by hand, earth auger or any other method and manual and hydraulic jacking of pipe under said surfaces. Installation of septic tanks, cesspools and drain fields.

**Inspection, Maintenance and Repair of Underground Utilities and Sewers.** All underground and preparatory work, which includes televised inspections, telegrouting, root cutting, herbicide application, lining, vacuuming, vacuum excavation, and jetting, in new or existing utilities, water mains, structures, shafts, tunnels, sewers, drains, pipes and related structures of every character and description; all work performed on the ground when excavating with a vac-truck.

**Underpinning, Lagging, Bracing, Propping and Shoring.** Underpinning, lagging, bracing, propping and shoring, raising and moving of all structures; raising of structure by manual or hydraulic jacks or other methods. All work on house moving, shoring and underpinning of structures, loading, signaling, right-of-way clearing along the route of movement. Resetting of structure in new location to include all site clearing, excavation for foundation and concrete work. Cleanup and backfilling, landscaping old and new site.

**Drilling and Blasting.** All work of drilling, jackhammering and blasting. Operation of all rock and concrete drills, including handling, carrying, laying out of hoses, steel handling, installation of all temporary lines and handling and laying of all blasting mats. All work in connection with blasting, handling and storage of explosives carrying to point of blasting, loading holes, setting fuses, making primers and exploding charges. All securing of surfaces with wire mesh and any other material and setting of necessary bolts and rods and anchor same. All high scaling and other rock breaking and removal after

blast. Handling and laying of nets and other safety devices and signaling, flagging, road guarding.

**Signalmen.** Signalmen on all construction work defined herein, including traffic control signalmen at construction site.

**General Excavation and Grading.** The clearing, excavating, filling, backfilling, grading and landscaping of all sites for all purposes and all labor connected therewith, including chainmen, rodmen, grade markers, etc.

**Factories.** All work in factories, mills, power stations, oil refineries, chemical plants and industrial plants performed now or as may be acquired hereafter, including packers, cutters, loaders, raw material unloaders, checkers, stuffers, production line personnel and stenciling of materials. Handling of raw pigment; vessel cleaners and/or dryers; washing or cleaning laboratory glassware; stocking of materials in laboratories; the cleaning and/or scrubbing, washing, polishing of all floors, glasses, windows, walls, rest rooms and furniture. All fire watch attendants when multi-craft personnel are used, and all general area firewatch. Attendants for all confined space entry when multi-craft personnel are used. All attendants for foreign material exclusion when single or multi-craft are used.

**General.** Material yards, junk yards, asphalt plants, concrete products plants, cemeteries, landscape nurseries and the cleaning or reconditioning of streets, ways, sewers and water lines and all maintenance work and work of an unskilled and semi-skilled nature, including Laborers in shipyards, tank cleaners, ship scalers, shipwright helpers, watchmen, flagmen, guards, security and safety men, toolroom men, park, sports area and all recreational center Employees, utilities Employees, horticultural and agricultural workers, garbage and debris handlers and cleaner.

**Pits, Yards, Quarries, Etc.** All drillers, blasters and/or powdermen, nippers, signalmen, Laborers in quarries, crushed stone yards and gravel and sand pits and

other similar plants, including temporary and portable batching plants.

**Wrecking.** The wrecking or dismantling of buildings and all structures, breaking away roof materials, beams of all kinds, with use of cutting or other wrecking tools as necessary. Burning or otherwise cutting all steel structural beams. Breaking away, cleaning and removal of all masonry and wood or metal fixtures for salvage or scrap. All hooking on and signaling when materials for salvage or scrap are removed by crane or derrick. All loading and unloading of materials carried away from the site of wrecking. All work in salvage or junk yards in connection with cutting, cleaning, storing, stockpiling or handling of materials. All clean-up removal of debris, burning, back-filling and landscaping of the site of wrecked structures.

**Railroad Track Work.** Right-of-way clearance as described above, excavation, grading, subgrading, bal-lasting and compacting of right-of-way. Loading, unload-ing, stockpiling, handling and distribution of track and ties and placing of or jacking track and ties at point of installation. All burning or otherwise cutting of track. Setting of tie plates, bolting, leveling, and gauging of rails and all spiking, whether by hand or mechanical means. Placing and tamping of ballast by hand or mechanical means. Construction and/or relocation of main line, shoe flies, sidings, gradings, crossings, relocating of pipes and drainage and culverts and connected with same and removal and replacing of all fences.

**Studio Utility Employees.** All such work as herein described as may be pertinent to and part of the operation of Motion Picture and other related type of studios.

**Use of Tools.** Operation of all hand, pneumatic, electrical, motor, combustion or air-driven tools or equip-ment necessary for the performance of work described herein. In short, all unskilled labor connected with work undertaken by members of the party of the first part, and the handling of all materials or appliances in any trade where it will be more economical to have the work per-

58

formed by Laborers as may be decided by the Employer, subject to appeal to and decision of the Joint Grievance Committee.

**Miscellaneous.** All such work and jurisdiction as may have been acquired by reason of amalgamation or merger with former national or international Unions and as may be hereafter acquired; including all such work and jurisdiction as declared by actions of the Executive Council or conventions of the American Federation of Labor.

**Paragraph 5. WORK NOT INCLUDED.** The laboring work not included in this Agreement is general excavating for buildings to the bottom of floor level. If there are any sub-basements or cellars, this general excavation shall be considered to extend to the bottom of the floor, of same. Excavation in basement and sub-basements other than by power equipment shall be done by Laborers at Building Laborers' rate (except where caisson rates apply).

**Paragraph 6. WRECKING.** Where a building is only partially wrecked and parts torn down for the purpose of building additions, alterations, remodeling, or repairing same, such work is covered by this Agreement, and rates as established herein shall apply.

**Paragraph 6(a). WRECKING: COMPLETE DEMOLITION.** Work pertaining to wrecking of buildings and structures in their entirety and removed to the basement floor level is covered by the Agreement between Local No. 225 of the Laborers' District Council and the Labor Committee representing the Wrecking Industry of Chicago and Vicinity, and the rates established by said Agreement shall apply.

**Paragraph 7. FLYING FORMS.** Laborers shall tend the Carpenters when prefabricating the Flying Forms on the ground.

When Flying Forms are used on each floor, Laborers shall assist in the placing of Steel Tubular Scaffolding and Flying Forms.

When Concrete Floors are poured and Flying Forms are removed, Laborers will assist.

Laborers will clean and oil Flying Forms after each concrete pour.

After the last concrete pour, when Flying Forms will not be re-used on job site, Laborers will remove, clean and dismantle, oil and place in a stockpile.

## ARTICLE XVIII
## ALCOHOL AND SUBSTANCE ABUSE

The parties incorporate the CISCO Uniform Drug/Alcohol Abuse Program, as modified, attached hereto as Addendum.

It is recognized that some client owners require additional substance abuse procedures to be followed on their projects for all trades, and it shall not be a violation of this agreement for signatory Employers to comply with such procedures, provided prior written notification is given to the District Council.

## ARTICLE XIX
## PRE-JOB CONFERENCES

If the Union elects, a pre-job conference prior to commencement of work shall be held or if need is for additional men after the job has started, then the conference shall be held before the additional hiring commences if the Union elects. At the pre-job conference, the Employer shall advise the Union of its requirements as to workmen required in the respective classifications, the probable starting date, duration of the job, subcontractors, and working schedules.

## ARTICLE XX
## ACCESS TO PREMISES

Authorized representatives of the Union shall have access to all construction projects, provided that they first notify the Employer of their arrival, that they do not stop the progress of the project (except to the extent as may be authorized in this Agreement), and provided further that such representatives fully comply with the visitor and security rules established for the construction project by the general contractor and the owner. It shall be the duty of the Employer to provide adequate passes, as requested by the Union, provided the Employer is able to do so.

## ARTICLE XXI
## APPROVALS

**Paragraph 1.** It is mutually agreed that the Construction and General Laborers' District Council of Chicago and Vicinity shall, in writing, by an authorized officer, approve and guarantee the fulfillment of all the provisions of this Agreement.

**Paragraph 2.** Inasmuch as the employment of Laborers is directly affected by the hours of employment of Carpenters, Bricklayers, Plasterers, Cement Masons and Hoisting Engineers engaged in construction, it is agreed that should the trades change their work day or work week, other than provided in this Agreement, either party hereto shall have the right upon ten (10) days' written notice through United States Registered Mail Delivery, to amend this Agreement to meet such conditions of employment.

**Paragraph 3. SAVINGS CLAUSE.** Any provisions contained herein which is contrary to or held to be in violation of any State or Federal Law shall be void and of no force or effect, and this Contract shall be construed as though such void provision were not a part hereof, it being intended that the other provisions of this Contract shall not be affected thereby.

**Paragraph 4. EMPLOYER'S WARRANTY.** The signatory Associations and its bargaining association represent and warrant that they are the bargaining agents of all the individual Employers of the signatory Associations who are now or hereafter become members of said signatory Associations and who assign to one or more of the Associations full authority to negotiate and execute this Agreement.

**Paragraph 5. EXECUTION.** It is expressly agreed and understood that execution of this Agreement by authorized representatives of the signatory Associations shall be conclusively presumed sufficient legal execution by all individual contractors represented by said Associations and that individual executions are not required for this Agreement to be binding on such Contractors.

**CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY**

By: James P. Connolly, Business Manager

By: Charles LoVerde III, Secretary-Treasurer

**CHICAGOLAND ASSOCIATED GENERAL
CONTRACTORS**

**MASON CONTRACTORS' ASSOCIATION OF
GREATER CHICAGO**

**GREAT LAKES CONSTRUCTION ASSOCIATION**

**THE MID-AMERICA REGIONAL BARGAINING
ASSOCIATION**

By: Seth Gudeman, Chairman

62

**ADDENDUM**
**CONSTRUCTION INDUSTRY SERVICE**
**CORPORATION JOINT LABOR-MANAGEMENT**
**UNIFORM DRUG/ALCOHOL ABUSE PROGRAM**

### I. Policy Statement

The parties recognize the problems created by drug and alcohol abuse and the need to develop prevention and treatment programs. (Company Name), and the signatory unions seek to protect people and property, and to provide a safe working environment. The purpose of the following program is to establish and maintain a drug free, alcohol free, safe, health work environment for all of its Employees.

### II. Definitions

**a. Company Premises** - The term "Company Premises" as used in this policy includes all property, facilities, land, buildings, structures, automobiles, trucks and other vehicles owned, leased or used by the company. Construction job sites for which the company has responsibility are included.

**b. Prohibited Items & Substances** - Prohibited substances include illegal drugs (including controlled substances, look alike drugs and designer drugs), alcohol beverages, and drug paraphernalia in the possession of or being used by an Employee on the job.

**c. Employee** - Individuals, who perform work for (Company Name), including, but not limited to, management, supervision, engineering, craft workers and clerical personnel.

**d. Accident** - Any event resulting in injury to a person or property to which an Employee, or contractor/contractor's Employee, contributed as a direct or indirect cause.

**e. Incident** - An event which has all the attributes of an accident, except that no harm was caused to person or property.

63

**f. Reasonable Cause** - Reasonable cause shall be defined as excessive tardiness, excessive absenteeism, and erratic behavior such as noticeable imbalance, incoherence, and disorientation.

### III. Confidentiality

a. All parties to this policy and program have only the interest of Employees in mind, therefore, encourage any Employee with a substance abuse problem to come forward and voluntarily accept our assistance in dealing with the illness. An Employee assistance program will provide guidance and direction for you during your recovery period. If you volunteer for help, the company will make every reasonable effort to return you to work upon your recovery. The company will also take action to assure that your illness is handled in a confidential manner.

b. All actions taken under this policy and program will be confidential and disclosed only to those with a "need to know".

c. When a test is required, the specimen will be identified by a code number, not by name, to insure confidentiality of the donor. Each specimen container will be properly labeled and made tamper proof. The donor must witness this procedure.

d. Unless an initial positive result is confirmed as positive, it shall be deemed negative and reported by the laboratory as such.

e. The handling and transportation of such specimen will be properly documented through the strict chain of custody procedures.

### IV. Rules - Disciplinary Actions - Grievance Procedures

**1. Rules** - All Employees must report to work in a physical condition that will enable them to perform their jobs in a save and efficient manner. Employees shall not:

a. Use, possess, dispense or receive prohibited substances on or at the job site; or

64

b. report to work with any measurable amount of prohibited substances in their systems.

**2. Discipline** - When the company has reasonable cause to believe an Employee is under the influence of a prohibited substance, for reasons of safety, the Employee may be suspended until test results are available. If no test results are received after three (3) working days, the Employee, if available, shall be returned to work with back pay. If the test results prove negative, the Employee shall be reinstated with back pay. In all other cases:

a. Applicants testing positive for drug use will not be hired.

b. Employees who have not voluntarily come forward, and who test positive for drug use, will be terminated.

c. Employees who refuse to cooperate with testing procedures will be terminated.

d. Employees found in possession of drugs or drug paraphernalia will be terminated.

e. Employees found selling or distributing drugs will be terminated.

f. Employees found under the influence of alcohol while on duty, or while operating a company vehicle, will be subject to termination.

**3. Prescription Drugs** - Employees using prescription medication which may impair the performance of job duties, either mental or motor functions, must immediately inform their supervisors of such prescription drug use. For the safety of all Employees, the company will consult with you and your physician to determine if a re-assignment of duties is necessary. The company will attempt to accommodate your needs by making any appropriate re-assignment. However, if a re-assignment is not possible, you will be placed on temporary medical leave until released as fit for duty by a prescribed physician.

65

**4. Grievance** - All aspects of this policy and program shall be subject to the grievance procedure contained in the applicable collective bargaining agreement.

### V. Drug/Alcohol Testing

The parties to this policy and program agree that under certain circumstances, the company will find it necessary to conduct drug and alcohol testing. While "random" testing is not necessary for the proper operations of this policy and program, it may be necessary to require testing under the following conditions:

a. A pre-employment drug and alcohol test may be administered to all applicants for employment. Employees recalled to work by an Employer, and Employees referred to an Employer by the Union who are requested to be tested, shall be compensated at their regular hourly rate of pay for the time required in such testing;

b. A test may be administered in the event a supervisor has a reasonable cause to believe that the Employee has reported to work under the influence, or is or has been under the influence while on the job; or has violated this drug policy. During the process of establishing reasonable cause for testing, the Employee has the right to request his on- site representative to be present;

c. Testing may be required if an Employee is involved in a workplace accident/incident or if there is a workplace injury;

d Testing may be required as part of a follow-up to counseling or rehabilitation for substance abuse, for up to a one (1) year period.

Each Employee will be required to sign a consent and chain of custody form, assuring proper documentation and accuracy. If an Employee refuses to sign a consent form authorizing the test, ongoing employment by the company will be terminated.

Drug testing will be conducted by an independent accredited laboratory (National Institute on Drug Abuse

66

and/or College of American Pathology), and may consist of either blood or urine tests, or both as required. Blood tests will be utilized for post accident investigation only.

The company will bear the costs of all testing procedures.

**VI. Rehabilitation and Employee Assistance Program**

Employees are encouraged to seek help for a drug or alcohol problem before it deteriorates into a disciplinary matter. If an Employee voluntarily notifies supervision that he or she may have a substance abuse problem, the company will assist in locating a suitable Employee assistance program for treatment, and will counsel the Employee regarding medical benefits available under the company or Union health and welfare/insurance program.

If treatment necessitates time away from work, the company shall provide for the Employee an unpaid leave of absence for purposes of participation in an agreed upon treatment program. An Employee who successfully completes a rehabilitation program shall be reinstated to his/her former employment status, if work for which he/she is qualified exists.

Employees returning to work after successfully completing the rehabilitation program will be subject to drug tests without prior notice for a period of one year. A positive test will then result in disciplinary action as previously outlined in this policy and program.

**WORK RULES COMMITTEE**

The Union and MARBA together shall create a Work Rules Committee consisting of an equal number of members representing each party with no more than three (3) persons from each. Alternate members may be appointed. The purpose of this Committee shall be to consider, discuss, and propose, under appropriate circumstances, Work Rule changes to the Agreements.

No discussions by or meetings of the Committee shall be considered to be a reopening of the Agreements. At all times, the no-strike and no-lockout provisions of the Agreements shall remain in full force and effect.

Any Work Rule changes proposed by the Committee must be ratified by the Union and MARBA.

**CONSTRUCTION AND GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY**

By: James P. Connolly, Business Manager

By: Charles LoVerde III, Secretary-Treasurer

**CHICAGOLAND ASSOCIATED GENERAL CONTRACTORS**

**MASON CONTRACTORS' ASSOCIATION OF GREATER CHICAGO**

**GREAT LAKES CONSTRUCTION ASSOCIATION**

**THE MID-AMERICA REGIONAL BARGAINING ASSOCIATION**

By: Seth Gudeman, Chairman

68

### Side Letter #1

Understanding the importance of verifying the prevailing wage under Illinois law and under the Davis-Bacon Act, the parties have agreed to meet during the contract term to develop a mutually agreeable procedure to provide information necessary to the Illinois Department of Labor to confirm the prevailing wage rate for work performed in the counties covered by their labor agreements.

### Side Letter #2

This serves to confirm our discussions during the 2017 labor negotiations concerning Union proposal No. 4, accepted by MARBA, which provides as follows: *"Revise language to state "each hour worked by all Employees <u>who are</u> covered by this Agreement..... ""*

As we discussed, the intent of the proposal is to better enable the fringe benefit funds to seek contributions from those employers who may split hours worked by employees covered by the MARBA agreements; and further, that the intent is not to change which employees are covered by the Agreement. The parties also agreed that the language is not intended to permit employers to "buy" benefits for certain workers by having employees, otherwise not covered by the labor agreements, perform Laborers' work on an insignificant basis.

To that end, the parties agreed that the Trustees of the fringe benefit funds will formulate a policy that encapsulates the aforementioned intent of the agreed upon language.

**NOTES**